LAWRENCE KOGAN HUBERMAN, recurrente, *v.* EL REGISTRADOR DE LA PROPIEDAD DE SAN JUAN, SECCIÓN TERCERA, recurrido.

*Número:* CE-87-177 *Resuelto:* 8 de marzo de 1990

640

641

*Roberto López García,* abogado del recurrente; el Registrador de la Propiedad recurrido compareció por escrito.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

Mediante el presente recurso gubernativo se solicita revisión de la recalificación hecha por el Hon. Wilfredo Muñoz Román, Registrador de la Propiedad de la Sección Tercera de San Juan, por la cual se deniega la inscripción a una escritura de compraventa. Expresó el Registrador de la Propiedad que se "'[d]enega[b]a la inscripción de este documento . . . por observarse que no se pueden vender cuotas específicas en una finca que no se haya adjudicado antes en la correspondiente partición y que Lawrence Kogan Huberman comparece en representación de los Fideicomisos Brian Kogan y Allison Kogan y como comprador lo que constituye conflicto de intereses y se toma en su lugar anotación preventiva por el término legal de 60 días a favor del comprador . . .". Apéndice 7, pág. 32.

En la escritura objeto de la recalificación comparece como comprador el Sr. Lawrence Kogan Huberman[1] y como vendedora la sucesión de Don Saúl Kogan Finkelstein, compuesta por las siguientes personas y fideicomisos: Aida Huberman Ingerson, la cónyuge supérstite representada por Lawrence Kogan Huberman; Lawrence Kogan Huberman; los fideicomisos Brian Kogan Glass y Alison Kogan Glass, representados por su fiduciario el Sr. Lawrence Kogan Huberman; Myrna Kogan Huberman, representada por

---

[1] El Sr. Lawrence Kogan Huberman al momento de adquirir la propiedad era casado en segundas nupcias, pero había otorgado capitulaciones matrimoniales que establecían una completa y total separación de bienes entre éste y su cónyuge.

Edith Acosta Medina; George Kogan Huberman, y los fideicomisos Stephanie Borus Kogan, Karin Borus Kogan y David Borus Kogan, representados por su fiduciaria Myrna Kogan Huberman. El objeto de la escritura de compraventa es
un bien inmueble perteneciente a la sucesión de Saúl Kogan
Finkelstein la cual no ha sido sometida a partición.(2) Como
podrá observarse, el Sr. Lawrence Kogan Huberman comparece en dicha escritura en varias capacidades: como comprador, como heredero vendedor, como fiduciario representante
de los fideicomisos Brian Kogan Glass y Alison Kogan Glass,
herederos vendedores, y como mandatario de Aida Huberman Ingerson, cónyuge supérstite.

I

*Prohibición del Art. 95 de la Ley Hipotecaria y del Registro
de la Propiedad de la inscripción de la enajenación por una
comunidad hereditaria de un bien específico*

■ El Registrador de la Propiedad fundamenta su primer señalamiento de falta que impide la inscripción en el
Art. 95 de la Ley Hipotecaria y del Registro de la Propiedad
(en adelante Ley Hipotecaria), Ley Núm. 198 de 8 de agosto
de 1979 (30 L.P.R.A. sec. 2316), que dispone que "[n]o se
inscribirán enajenaciones o gravámenes de cuotas específicas en una finca que no se haya adjudicado antes en la correspondiente partición".

■ La enajenación de una cosa específica por la comunidad hereditaria no ha sido dispuesta en particular por
nuestro Código Civil. M. Albaladejo, *Comentarios al Código
Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Pri

---

(2) Propiedad inmueble inscrita al Folio 107 del Tomo 660 de Monacillos,
finca Núm. 21,609.

650

vado, 1985, T. V, Vol. 2, pág. 426. El Código Civil no reglamenta la figura jurídica de la comunidad hereditaria.[3]

 Sobre esto expresa el profesor González Tejera que "[c]on la muerte de una persona . . . se produce un desplazamiento en las relaciones jurídicas de las cuales era titular el causante sobre bienes, derechos y obligaciones".[4] La comunidad hereditaria recae sobre la herencia considerada como una *universitas iuris.* J. Ferrandis Vilella, *La Comunidad Hereditaria,* Barcelona, Ed. Bosch, 1954, pág. 21. "Una vez inscrita en el Registro la declaratoria o el testamento sobre una o varias fincas del causante, todo lo que tienen los herederos es una cotitularidad en una masa común que es la herencia. No tienen una participación específica en dicha finca o fincas. No se inscribe una cuota indivisa sobre cada finca o derecho que integra la herencia sino una *participación en abstracto y global sobre el patrimonio hereditario completo.*" (Énfasis suplido.) C. Rocafort, *Breves comentarios en torno a los requisitos de inscripciones del derecho hereditario y su enajenación bajo el Artículo 95 de la Ley Hipotecaria,* 9 ANOTA 5 (sept.–oct. 1987) (en adelante ANOTA). También, véanse: L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil,* 2da ed., Madrid, Ed. Tecnos, 1982, pág. 699; E. González Tejera, *Derecho Sucesorio Puertorriqueño,* San Juan, Ed. Ramallo, 1983, T. 1, págs. 294–295. J.

---

[3] Sólo en el Art. 1005 del Código Civil, 31 L.P.R.A. sec. 2871, se confirma su existencia al mencionar su terminación:

"Ningún coheredero podrá ser obligado a permanecer en la indivisión de la herencia, a menos que el testador prohiba expresamente la división. Esta prohibición no alcanzará a los bienes que constituyen la legítima de los herederos.

"En todo caso, la división tendrá siempre lugar mediante alguna de las causas por las cuales se extingue la sociedad."

La falta de reglamentación específica ha producido problemas e innumerables debates en torno a la indivisión hereditaria. J. Castán Tobeñas, *Derecho civil español, común y foral,* 8va ed., Madrid, Ed. Reus, 1978, T. VI, Vol. I, pág. 296.

[4] E. González Tejera, *Derecho Sucesorio Puertorriqueño,* San Juan, Ed. Ramallo, 1983, T. I, pág. 143.

Castán Tobeñas, *Derecho civil español, común y foral,* 8va ed., Madrid, Ed. Reus, 1978, T. VI, Vol. 1, págs. 298–299, señala como características generales de la comunidad hereditaria que ésta es universal por cuanto recae sobre la unidad patrimonial de la herencia; que es forzosa en cuanto surge con independencia absoluta de la voluntad de los titulares, y que es transitoria, pues se constituye por la ley para disolverse por la partición.

 Dada la ausencia de una reglamentación detallada de la comunidad hereditaria en el Código Civil, ésta se rige en primera instancia "'por las disposiciones imperativas del Código civil; luego, por la voluntad del causante; luego, por las disposiciones que, dentro del título de la división de la herencia, le sea . . . aplicable; y, [por último], por las disposiciones generales contenidas en el [capítulo sobre comunidad de bienes], en lo que fueren compatibles con ser la here[ncia] una comunidad universal'". *Cintrón Vélez v. Cintrón de Jesús,* 120 D.P.R. 39, 49 (1987). Véanse: Ferrandis Vilella, *op. cit.,* págs. 79 y 154; *Cabañas et al. v. El Registrador de la Propiedad,* 8 D.P.R. 73, 78 (1905).(⁵)

 Hay que distinguir, sin embargo, entre la comunidad hereditaria y la comunidad de bienes en general. En

---

(⁵) El Art. 326 del Código Civil, 31 L.P.R.A. sec. 1271, provee que "[h]ay comunidad cuando la propiedad de una cosa o de un derecho pertenece pro indiviso a varias personas. A falta de contratos o disposiciones especiales, se regirá la comunidad por las prescripciones de las secciones 1271 a 1285 de este título".

Ferrandis Vilella, a su vez, entiende que el Art. 326 del Código Civil, *supra,* señala una prelación de las fuentes legales que regirán la comunidad hereditaria:

"1ro. Por la voluntad del testador o por los pactos de los mismos coherederos cuando hayan disciplinado contractualmente su relación.

"2do. Por disposiciones especiales, que pueden ser las que contiene el Código en materia de partición (arts. 1.051 ss.), colación (arts. 1.035 ss.), pago de las deudas hereditarias (arts. 1.082 ss.), etc. o las establecidas por leyes especiales.

"3ro. A falta de una regulación voluntaria (testamento o contrato entre los coherederos) o de disposiciones especiales, por las prescripciones del título III, libro 2do del C.c." (Escolios omitidos.) J. Ferrandis Vilella, *La Comunidad Hereditaria,* Barcelona, Ed. Bosch, 1954, pág. 154.

esta última coinciden varios titulares sobre uno o más bienes determinados, mientras que la comunidad hereditaria se refiere a la cotitularidad sobre un patrimonio relicto con sus múltiples elementos de activo y pasivo. Los interesados tienen sobre el patrimonio del causante la titularidad de una cuota en abstracto, pero no sobre bienes en particular. González Tejera, *op. cit.*, págs. 294–295. También refiérase a Albaladejo, *op. cit.*, Vol. 1, pág. 269; J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1975, T. V, Vol. I, pág. 365. Cada heredero, mientras la partición no se efectúa, tiene simplemente un derecho en el complejo hereditario. Castán Tobeñas, *op. cit.*, pág. 295, citado con aprobación en *Cintrón Vélez v. Cintrón de Jesús*, supra, pág. 48. "[C]on la aceptación cada coheredero adquiere un derecho independiente sobre la herencia . . . y la cuota que en ella le corresponde ingresa inmediatamente en su patrimonio como un valor *autónomo e independiente que sólo a él pertenece* y del que, por tanto, puede disponer con entera libertad." (Énfasis suplido.) Ferrandis Vilella, *op. cit.*, pág. 187.

Por ello, durante la comunidad hereditaria cada partícipe puede enajenar su cuota abstracta. *Burgos v. Hernández*, 54 D.P.R. 37, 40 (1938). De otra parte, también se puede dar una venta de *cosa específica* perteneciente a la comunidad hereditaria antes de la partición cuando todos los herederos comuneros dan su consentimiento. *Cabañas et al. v. El Registrador de la Propiedad*, supra, pág. 77; S. de 15 de febrero de 1947, Núm. 150, XIV *Repertorio de Jurisprudencia* 105; Albaladejo, *op. cit.*, Vol. 2, pág. 428. Según De La Cámara, todos los copartícipes de la comunidad hereditaria pueden vender un objeto de la herencia o gravar parte de ésta, "pues la naturaleza del condominio y la aritmética nos enseñan que la suma de los derechos de los condueños equivalen al de un propietario singular". Todos los coherederos actuando en conjunto pueden realizar "cualesquiera de los

actos que uno o varios no podrán llevar a efecto . . . . [N]o existe disposición hipotecaria que derogue tales normas civiles".(6)

En el derecho español la Ley Hipotecaria eliminó el acceso al Registro de la Propiedad del derecho hereditario por vía de asiento de inscripción, prefiriendo la utilización de la anotación preventiva. Art. 42(6) de la Ley Hipotecaria de España. El propósito de la legislación española fue "hacer cesar el equívoco que, con la inscripción del derecho hereditario se producía. El hecho de figurar registrado este derecho por medio de un asiento de inscripción, como si se tratara del dominio o cualquier otro derecho real sobre una finca singularmente considerada daba lugar a cierta confusión, haciendo creer que lo que estaba inscrito era una cuota indivisa sobre cada finca o derecho integrante de la herencia y no una participación abstracta y global sobre el patrimonio hereditario contemplado como una unidad u objeto superior". (Énfasis suprimido.) R. Roca Sastre, *Derecho Hipotecario*, Barcelona, Ed. Bosch, 1979, T. IV, Vol. 1, pág. 62. También, véanse: Ferrandis Vilella, *op. cit.*, pág. 186; R. Roca Sastre, *El Registro y el Derecho de Sucesiones*, Madrid, Estudios Varios, Instituto de España, 1988, pág. 381.

A diferencia de España, en Puerto Rico permaneció el acceso al registro del derecho hereditario por vía de asiento de inscripción. Esto, sin embargo, no significa un repudio a los antes mencionados principios de derechos de los coherederos en la comunidad. El Art. 95 de la Ley Hipotecaria, *supra*, claramente señala que "no se inscribirán enajenaciones o gravámenes de cuotas específicas en una finca que no se haya adjudicado antes en la correspondiente parti-

---

(6) De La Cámara y García Arango, según citados en A. García-Bernardo, *Los derechos de cada coheredero en la disposición conjunta y el tracto sucesivo*, 49–50 Rev. Der. Notarial 83, 102 y 175 (1965).

ción". En *Colón Gutiérrez v. Registrador*, 114 D.P.R. 850, 854 esc. 5 (1983), hicimos referencia al historial legislativo y expresamos que el Art. 95 de la Ley Hipotecaria, *supra*, "'incluye una disposición inspirada en la legislación española, muy acorde con el Código Civil en cuanto a la naturaleza del derecho hereditario. Se incluye expresamente, para que no haya dudas, que las enajenaciones de cuotas específicas no adjudicadas no serán inscribibles. Esto para la defensa de posteriores adquirientes contra condiciones no expresas, pues es sabido que dichas enajenaciones quedan sujetas a futuras particiones entre los herederos. *Queda claro que la totalidad o parte del derecho hereditario, en abstracto, sí es enajenable*'". (Énfasis suplido.) Ferrandis Vilella explica que "[e]l precepto está dictado indudablemente para la comunidad hereditaria, ya que el supuesto de que parte es el de que no se hayan atribu[i]do bienes determinados a cada coheredero . . . ni parte o cuotas *en cada objeto* de la herencia . . . sino que cada coheredero es titular simplemente de una cuota o parte indivisa *en el patrimonio hereditario*". (Énfasis en el original.)(7) Continúa diciendo que "[e]l régimen de los actos de disposición es, pues, el siguiente: todos los coherederos *conjuntamente* (unanimidad) pueden realizar con plena validez y efectos cualesquiera actos de disposición sobre bienes particulares de la herencia; pero ninguno de ellos puede disponer *aisladamente* de tales bienes ni de parte de cualquiera de ellos, porque no tiene verdadero título de dominio en bienes concretos y determinados mientras no se lleve a cabo la partición de la herencia". (Énfasis en el original.)(8)

 Debe tenerse presente también que el concepto de *adjudicación* hereditaria de bienes a que hace referencia

---

(7) Ferrandis Vilella, *op. cit.*, págs. 185–186.

(8) Ibíd., págs. 173–174. *Cf. Osorio v. Registrador*, 113 D.P.R. 36 (1982).

el Art. 95 de la Ley Hipotecaria, *supra*, no es sinónimo de *enajenación*. Roca Sastre explica que hay "que dar a la palabra *adjudicación* de bienes en pago de haber hereditario, la amplitud derivada de un acto que provoca aquella transformación total o parcial del derecho hereditario en derecho concreto sobre bienes singularmente considerados o en cuotas indivisas de los mismos . . . [y d]ebido a esta metamorfosis es por lo que estas adjudicaciones de bienes pueden ingresar a los libros hipotecarios por medio de asientos de inscripción . . .".(9)

En el caso de autos no estamos ante la enajenación de cuotas específicas, las cuales no tienen acceso al Registro de la Propiedad, ni ante enajenaciones de cuotas indivisas sobre bien específico perteneciente a la herencia, lo cual contraviene el derecho hereditario y está vedado por el Art. 95 de la Ley Hipotecaria, *supra*, ni ante una adjudicación parcial o total de bienes hereditarios. Se trata, por el contrario, de una enajenación de un bien específico de la comunidad hereditaria con el consentimiento de todos los herederos. Al no existir prohibición de la venta del bien inmueble específico por parte del testador o pacto a tales efectos de los coherederos, ni disposiciones especiales o prohibiciones sobre la comunidad de bienes en general que impidan dicha enajenación, por lo tanto no está vedada por el Art. 95 de la Ley Hipotecaria, *supra*.

II

## El autocontrato

El Registrador de la Propiedad señala, también, como falta que impide la inscripción que el Sr. Lawrence Kogan

---

(9) R. Roca Sastre, *Derecho Hipotecario*, Barcelona, Ed. Bosch, 1948, T. II, pág. 613.

Huberman comparece en la escritura de compraventa como comprador, vendedor, heredero y representante de los fideicomisos Brian Kogan y Allison Kogan.

A continuación se discute la legalidad del autocontrato según éste se configura en el caso de autos. Esto es, el señor Kogan Huberman comparece como comprador de un bien perteneciente al caudal hereditario sin haberse hecho la correspondiente partición y adjudicación, y a la vez comparece como coheredero vendedor de su participación en dicho bien. En lo que se refiere al fideicomiso, refiérase a las partes III y V de este recurso.

Reiteradamente hemos señalado que la sucesión o comunidad hereditaria no es persona jurídica. *Vega v. García*, 61 D.P.R. 99 (1942); *Arvelo et al. v. Banco Ter. y Ag. de P.R.*, 25 D.P.R. 728 (1917); González Tejera, *op. cit.*, pág. 40. La comunidad hereditaria es "una titularidad fraccionada, no una unidad jurídica que absorba los derechos de los individuos; los derechos sobre las cosas comunes, a través de las cuotas, reposan individualmente sobre cada comunero". Ferrandis Vilella, *op. cit.*, pág. 75. Uno de los argumentos que más persuade en apoyo de la anterior conclusión es que la personalidad jurídica es una "creación exclusiva de la ley . . . [que] nace de la iniciativa privada con el reconocimiento expreso del legislador". Ferrandis Vilella, *op. cit.*, pág. 74. Por lo tanto, al no tener la comunidad hereditaria personalidad jurídica y ser el comprador uno de los herederos, nos enfrentamos con una situación de autocontratación.

La figura jurídica del autocontrato, a su vez, tampoco está reglamentada por nuestro Código Civil ni ha sido motivo de amplia discusión en nuestra jurisprudencia. En *Pabón v. Registrador*, 75 D.P.R. 463, 466 (1953), nos limitamos a señalar que la figura del autocontrato no debe ser favorecida dentro de la teoría general de las obligaciones.

Dicha opinión, al igual que la jurisprudencia española de comienzos de siglo, repudiaba el autocontrato debido a que éste no podía ser enmarcado o configurado como un contrato según el Código Civil.(10) Sin embargo, la jurisprudencia española evolucionó y reconoció la existencia del autocontrato. F. De Castro, *El autocontrato en el derecho privado español*, 151 Rev. Gen. Leg. Jur. 334, 378–379 (1927).

De Castro define el autocontrato como un acto unilateral de voluntad el cual pone en relación dos (2) patrimonios independientes. Es decir, que "con una sola voluntad se ponen en relación jurídica dos patrimonios, y estos dos patrimonios se encuentran ligados uno respecto al otro, en virtud del poder que el auto contrayente tiene sobre ambos".(11) No obstante, existen discrepancias entre los comentaristas en cuanto a si puede existir pluralidad de patrimonios de una sola persona. De Castro señala que lo anterior no debe ser impedimento, ya que si se quiere se puede pensar, en vez de en dos (2) patrimonios de sólo una persona, en que "una persona tenga una parte de su patrimonio por determinadas consideraciones sometido a un régimen jurídico especial".(12) El autocontrato no se considera un contrato, sino un negocio jurídico unilateral de carácter especial donde sólo hay una voluntad o declaración. L. Díez-Picazo, *Funda-*

---

(10) En *Pabón v. Registrador*, 75 D.P.R. 463, 466 (1953), señalamos lo siguiente:

"Estamos frente a una de esas curiosas modalidades de lo que en derecho civil se conoce como autocontrato, o sea, el contrato mediante el cual una persona puede contratar consigo mismo, sin la concurrencia de voluntades que presupone el contrato."

Idénticas inquietudes motivaron al Tribunal Supremo de España a rechazar la figura del autocontrato en su Sentencia de 6 de marzo de 1909 (Publicada el 4 y 5 de noviembre). F. De Castro, *El autocontrato en el derecho privado español*, 151 Rev. Gen. Leg. Jur. 334, 380–382 (1927).

(11) F. De Castro, *El autocontrato en el derecho privado español*, 151 Rev. Gen. Leg. Jur. 334, 386 (1927).

(12) Ibíd., págs. 369 n. 1 y 371.

*mentos del Derecho Civil Patrimonial,* Madrid, Ed. Tecnos, 1979, Vol. I, pág. 127. "Su único nexo, su único parecido con el contrato y es lo que le ha valido su nombre, tan sólo consiste en producir efectos jurídicos, crear relaciones de derecho entre dos conjuntos patrimoniales." De Castro, *supra,* pág. 365.

■■■■ Nuestro derecho positivo sólo atiende la figura del autocontrato en dos (2) situaciones principales.[13] En el Art. 1348(2) del Código Civil, 31 L.P.R.A. sec. 3773(2), que prohíbe que los mandatarios compren las cosas de cuya enajenación estuviesen encargados, y en el Art. 185 del Código de Comercio, 10 L.P.R.A. sec. 1544, que dispone que ningún comisionista comprará para sí ni para otro las cosas que se le hayan mandado a vender ni venderá las que se le hayan mandado a comprar sin licencia del comitente. Estos dos (2) casos de autocontrato envuelven la figura del representante, quien no agrega elemento de carácter esencial alguno al autocontrato. Sin embargo, esta figura no sólo une a dos (2) patrimonios, sino también a dos (2) personas. De Castro, *supra,* págs. 364–365. La figura del representante trae en la mayoría de los casos un conflicto de intereses, razón principal ésta para la prohibición. Díez-Picazo, *op. cit.,* pág. 128; M. Albaladejo, *Comentarios al Código Civil y compilaciones forales,* Madrid, Ed. Rev. Der. Privado, 1980, T. XIX, pág. 125; De Castro, *supra,* págs. 364–365.

■■■■ En las fuentes del derecho romano no existe una regla general que excluya al autocontrato. Este, por lo tanto, "es admisible excepto en los casos en que por su especial peligro de una determinada institución se proh[í]be" como ocurre con el mandato y la comisión. De Castro, *supra,* págs.

---

[13] En el Art. 215 del Código Civil, 31 L.P.R.A. sec. 789, en cuanto a las prohibiciones que se le imponen a los tutores, aparecen algunas disposiciones que de igual manera se pueden considerar como formas de autocontratación.

334–335 y 373.([14]) Esto no obstante, como veremos más adelante, no puede interpretarse como una prohibición radical que impida que, de violarse la prohibición por parte del mandatario, el mandante lo sancione favorablemente convirtiéndolo así en un acto válido. En conclusión, cuando hay "dos patrimonios independientes y una persona con poder de disposición sobre ambos, está dentro de los límites de su poder" crear entre ellos relaciones jurídicas obligatorias, siempre "que no traspasen las condiciones a que estén sometidos esos patrimonios especiales". De Castro, *supra*, pág. 377.

En el caso de autos comparece de una parte, como comprador, el señor Kogan Huberman con poder de disposición sobre su patrimonio personal. De otra parte, comparece como vendedora la comunidad hereditaria de Saúl Kogan, la cual no forma un patrimonio distinto del de cada titular, sino que la participación de cada heredero está perfectamente integrada en su patrimonio personal. *Rivera Rivera v. Monge Rivera*, 117 D.P.R. 464 (1986). Parte del patrimonio del señor Kogan Huberman está sometido al régimen jurídico especial de la comunidad hereditaria. En ese caso no hay colisión de intereses, ya que "tan sólo será preciso, para que sean válidas las relaciones que entre ellos se establezcan, que no traspasen las condiciones a que estén sometidos esos patrimonios especiales". De Castro, *supra*, pág. 377.([15]) Pudiendo

---

([14]) Por su parte, E. Sánchez Urite, *Mandato y Representación*, 2da ed., Buenos Aires, Ed. Abeledo-Perrot, 1986, pág. 117, favorece la autocontratación aun en los casos de mandato conforme él entiende que en tales casos "[d]ebemos distinguir perfectamente la voluntad del representante cuando éste actúa en nombre y por cuenta del poderdante; en este caso el representante conserva su propia personalidad y la posibilidad de disposición de sus bienes; no vemos que haya obstáculo alguno que se oponga a que realice simultáneamente una contratación que tenga por objeto sus bienes y los de la persona que él representa; o sea que por una parte actúa en nombre propio, y por la otra lo hace en nombre ajeno."

([15]) De Castro nos dice lo siguiente:

". . [M]ás bien que un problema de doctrina científica . . . es la teoría del

la comunidad hereditaria —con el consentimiento de todos los herederos— enajenar un bien específico, el autocontrato, de no haber prohibición específica, sería válido e inscribible.

## III

*La prohibición de compra del inciso (2) del Art. 1348 del Código Civil*

El Registrador de la Propiedad señala como impedimento para la inscripción que el Art. 1348(2) del Código Civil, *supra*, prohíbe la compra por el mandatario de los bienes de su mandante. Ante dicha expresión, hemos de considerar dos (2) situaciones distintas que se configuran en los hechos de este caso. Por un lado, tenemos la compra de un bien del fideicomiso por parte del fiduciario y, por otro, la compra por el mandatario de un bien cuya enajenación se le encomendó.

▬▬▬▬ Recientemente, en *Dennis, Metro Invs. v. City Fed. Savs.*, 121 D.P.R. 197 (1988), tuvimos la oportunidad de examinar e interpretar el Art. 1348(2), *supra*. Allí señalamos lo siguiente:

> . . . *que [esta disposición] "es de interpretación restringida y no cabe aplicarse extensivamente, ni aun por razón de analogía, a personas y cosas que no comprende" . . . y que, debido al carácter prohibitorio del precepto, "no se ha extendido en cuanto a su aplicación más que aquellos casos que caen claramente bajo su letra . . .".* Este artículo enumera varias "modificaciones de la capacidad para adquirir por compra", entre las cuales se encuentra la del mandatario en relación con los bienes que, en el momento de realizarse la venta, estén bajo su administración o sujetos a su facultad para enajenarlos. "Esta prohibición hace imposible la autocontratación o contrato con-

---

contrato consigo mismo de técnica jurídica . . . la función del legislador y de la *jurisprudencia* es la de buscar garantías y formas que hagan compatible la autocontratación con los principios tradicionales y *salvaguard[ar]*, los intereses de las partes contratantes." (Énfasis suplido.) De Castro, *supra*, pág. 385.

sigo mismo y produce una incapacidad especial o relativa."
(Cita omitida y énfasis suplido.) *Dennis, Metro Invs. v. City
Fed. Savs.*, supra, págs. 205–206.

 Albaladejo añade que este artículo "[p]resupone
un contrato de mandato vigente, sea civil o mercantil (comi-
sión) . . .". Albaladejo, *op. cit.*, T. XIX, pág. 137. Ante estos
principios de interpretación restrictiva no podemos concluir
que el Art. 1348(2) del Código Civil, *supra*, le sea aplicable a
un fideicomiso, el cual es una figura jurídica diferente al
mandato y está regulada por disposiciones especiales dis-
tintas. Arts. 1600 a 1630 del Código Civil, 31 L.P.R.A. secs.
4421 a 4488. Sobre la particularidad del fideicomiso en nues-
tro derecho, en *Dávila v. Agrait*, 116 D.P.R. 549, 554,
561–562 (1985), nos expresamos de la manera siguiente:

> El fideicomiso puertorriqueño es una institución con carac-
> teres particulares que incorpora los principios del *trust* anglo-
> sajón e intenta armonizarlos con nuestra tradición civilista.
>
> . . . . . . . .
>
> Actualmente las disposiciones del Código Civil se interpre-
> tan *liberalmente a favor de la libre disposición*. La regla de
> hermenéutica estatutaria es que tales preceptos no podrán
> ser invocados para frustrar un acto de disposición sancionado
> expresa o implícitamente por la ley de *trust*. (Énfasis suplido.)

 Al discutir el Art. 834 del Código Civil, 31 L.P.R.A.
sec. 2541, el cual llama la figura del fideicomiso "mandato
irrevocable", señalamos lo siguiente:

> Se importó de este modo el concepto de *trust* a la cultura
> jurídica latinoamericana, percibiéndolo como un mandato
> irrevocable, *una comisión o encargo sui géneris, especial,
> nuevo*, en el cual el mandante no pudiera deshacer y mediante
> el cual se desprendiera definitivamente del dominio de las
> cosas objeto del encargo.[6]

---

(6) Semejante visión del fideicomiso como un mandato irre-
vocable, *antitética y contradictoria* al decir del propio Alfaro,
*luego evoluciona* en su pensamiento y lo califica simplemente

como "*un acto*". (Énfasis suplido y cita omitida.) *Dávila v. Agrait*, supra, pág. 560.[16]

■ Resolvemos, pues, que al fideicomiso, dado su carácter particular y distinto al mandato, no le es de aplicación el Art. 1348(2) del Código Civil, *supra*, que prohíbe la compra por el mandatario de los bienes del mandante.

Aclarado lo anterior, pasamos a examinar aquella parte del señalamiento de error relativa a la compra por parte del señor Kogan de un bien en el cual su mandante tiene una participación.

■ En cuanto a la prohibición que establece el Art. 1348(2) del Código Civil, *supra*, respecto a la adquisición por compra por parte de los mandatarios de los bienes de cuya administración o enajenación estuvieren encargados, cuando un apoderado compra bienes de su mandante contra la prohibición de la ley, dicho contrato no tiene carácter de inexistente, sino que es anulable y también puede ser ratificado. *Alvarez v. Riera*, 20 D.P.R. 324 (1914); *Dennis, Metro Invs. v. City Fed. Savs.*, supra. Se considera que la compra por el mandatario de los bienes de su mandante adolece de nulidad

---

[16] Véase, también: L.F. Sánchez Vilella, *El Fideicomiso Puertorriqueño III*, 37 Rev. C. Abo. P.R. 417, 423 n. 19 (1976), en el cual se señala:

"Hacemos caso omiso de que también expresa que es un 'mandato', lo cual claramente no coincide con la concepción del *trust* que es una institución *sui generis* que no se asimila a ninguna otra figura del derecho angloamericano. La calificación, no obstante, no presenta ninguna desviación *práctica*, sino tan sólo *conceptual*. El propio Alfaro sugiere que la frase 'antitética y contradictoria' pudiera sustituirse por 'un contrato', 'un contrato especial', 'un contrato *sui generis*', 'un acto irrevocable', un 'acto jurídico' o simplemente 'un acto'. (Alfaro, páginas 42 y 45). En cuanto a este particular Alfaro se rindió sin dificultad a los autores que habían censurado la calificación del fideicomiso —que él mismo caracteriza como antitética y contradictoria— como un mandato irrevocable. Goldschmidt, *The Trust in the Countries of Latin America*, III Revista Jurídica Interamericana, 29, 32 (1961); Sánchez Vilella, *op. cit.* [*The Problems of Trust Legislation in Civil Law Jurisdictions*, 19 Tul. L.R. 374 (1945)] pág. 384. En su nuevo proyecto, artículo 1, Alfaro opta finalmente por calificar al fideicomiso como 'un acto'." (Énfasis en el original.)

relativa capaz de sanearse por la ratificación y la prescripción. *Zayas v. Orraca*, 80 D.P.R. 339, 352 (1958); *Oxios v. Registrador*, 39 D.P.R. 447 (1929).([17])

En los casos en que el mandante ratifica el acto de su mandatario, "dota de fuerza legal a un acto que carecía de ella, y que, por tanto, no era hasta entonces propiamente jurídico. [Se] purifica el acto o contrato de los vicios de que originalmente adolecía[,] de forma que produzca todos los efectos jurídicos que le son atribuibles . . .". *Madera v. Metropolitan Const. Corp.*, 95 D.P.R. 637, 646 (1967). Este acto fundamenta su efecto legal en el principio de que la "ratificación es acto unilateral, que únicamente necesita para su perfección y total eficacia el consentimiento del *dominus*". Q.M. Scaevola, *Código Civil*, Madrid, Ed. Reus, 1957, T. XXX, Vol. I, pág. 353.

Asimismo, los Arts. 1623 y 1624 del Código Civil, 31 L.P.R.A. secs. 4481 y 4482, reconocen la facultad del mandante de revocar en cualquier momento el mandato a su libre arbitrio, "justificándose esta facultad excepcional por el carácter de confianza que tiene este contrato . . .". D. Espín Cánovas, *Manual de Derecho Civil Español*, Madrid, Ed. Rev. Der. Privado, 1983, Vol. III, págs. 663–664. En ausencia de situaciones especiales donde exista algún plazo y aun en

---

([17]) Mediante las Sentencias de 3 de junio de 1949 y de 27 de mayo de 1959 —considerada la doctrina legal en cuanto a si se aplica la prohibición del Art. 1348 del Código Civil, 31 L.P.R.A. sec. 3773, al caso de compra realizada por el mandatario directamente al mandante— el Tribunal Supremo da lugar al recurso por considerar que "1°. El mandato para administrar o enajenar queda tácitamente revocado cuando interviene en la venta el propio mandante o representado por otro apoderado, 2°. Los bienes vendidos quedan exclu[i]dos de la relación de mandato produciéndose una novación objetiva extintiva, 3°. Es doctrina legal que la prohibición no rige cuando el mandatario no actúa con la doble personalidad de comprador y vendedor". M. Albaladejo, *Comentarios al Código Civil español y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1980, T. XIX, pág. 138 n. 36.

ocasión de la obligación de retribución, "[e]l principio de la completa y absoluta libertad y unilateralidad del mandante para revocar el mandato continúa siendo el principio imperante . . .". Albaladejo, *op. cit.*, 1986, T. XXI, Vol. 2, págs. 502–503. Véase L. Díez-Picazo y A. Gullón, *Instituciones de Derecho Civil*, Madrid, Ed. Tecnos, 1974, Vol. I, pág. 546.

■ "Los autores españoles y, en general, toda la doctrina internacional, han buscado el fundamento de esa regla de la revocabilidad que caracteriza el mandato, justificándola ya por la razón de estar fundado el mandato en la confianza que al mandante inspira el mandatario (de donde la regla 'finita voluntate finitum est mandatum'), ya por conferirse el mandato en interés del mandante, ya por la gratuidad que normalmente le acompaña, ya, en fin, como consecuencia del principio de la representación." F. Crespo Allue, *La Revocación del Mandato*, Madrid, Ed. Montecorvo, 1984, págs. 153–154.

■ La declaración revocatoria por parte del mandante no requiere de una forma en especial. Se entenderá revocada la relación de mandato, ya se haga de forma expresa, tácita y aun verbalmente, "siempre que ello constituya un medio suficientemente sensible e idóneo . . .". Albaladejo, *op. cit.*, págs. 503–504.

■ De acuerdo con los señalamientos que anteceden, el efecto implícito del acto de ratificación por parte del mandante no es otro que una revocación tácita de su mandato. Esto es así porque "[a]ntes de la ratificación existe un negocio para el *dominus*; después de la misma, un negocio del *dominus*". M.A. Del Arco Torres y M. Pons González, *Diccionario de Derecho Civil*, Pamplona, Ed. Aranzadi, 1984, T. 2, pág. 475.

■ En otras palabras, la ratificación convierte el acto de la venta del bien en un acto propio o autogestión cuyos

efectos jurídicos están reconocidos. Crespo Allue, *op. cit.*, pág. 179, a esos efectos señala que:

> El Código italiano de 1942 incluye, como uno de los supuestos de revocación tácita, la autogestión del negocio por el propio mandante, no así el Código francés o el nuestro, que sólo admiten la revocación tácita por nombramiento de nuevo mandatario. Sin embargo, la doctrina española viene admitiendo desde hace tiempo este supuesto de revocación que, aunque no regulado expresamente por nuestro Código, se infiere de la naturaleza del mandato mismo. En este sentido se ha manifestado la jurisprudencia desde principios de siglo. (Escolios omitidos.)

Independientemente de cómo se vea o interprete, el efecto final de la ratificación no es otro que la venta por el mandante de sus bienes a quien fuera su mandatario. En este caso hemos expresado que "cuando el mismo mandante vende los bienes a su mandatario ello tiene el efecto de hacer cesar el mandato y desaparece así el motivo legal de la incapacidad que consiste en que el mandatario forma con el mandante una sola persona jurídica", *Piazza v. Piazza*, 83 D.P.R. 414, 425 (1961), según citada en *Dennis, Metro Invs. v. City Fed. Savs.*, supra. L. Díez-Picazo, *La Representación en el Derecho Privado*, Madrid, Ed. Civitas, 1979, pág. 109, al comentar sobre el particular, señala que "la sanción que el precepto conlleva, cuando es infringido, no es una nulidad radical y absoluta, porque el mandante puede ratificar *a posteriori*, expresa o tácitamente, lo hecho por el mandatario; se trata por ende de una nulidad relativa o de una mera impugnabilidad". Sin embargo, nada de lo antes dicho altera el carácter de nulidad que tiene la compra por parte del mandatario de los bienes de su mandante en el supuesto de que no se ratifique el acto por parte del mandante.[18]

---

[18] En la situación de autos, la mandataria Aida Huberman Ingerson ratificó mediante escritura pública la compra de bienes por parte de su mandatario.

## IV

*Prohibición de compra del inciso (3) del Art. 1348 del Código Civil*

En relación con la segunda falta notificada por el Registrador de la Propiedad, éste también señala que por disposición del Art. 859 del Código Civil, 31 L.P.R.A. sec. 2566, el cual nos remite a los requisitos y las condiciones del tutor, se deben aplicar los Arts. 215 y 1348(3) de dicho código, 31 L.P.R.A. secs. 789 y 3773(3). Dichos artículos contienen una prohibición expresa en relación con la compra de los bienes del menor o incapaz por parte de su tutor, a menos que así lo autorice el tribunal. A la luz de los hechos particulares de este caso, no le asiste la razón.

▰▰▰ De acuerdo con lo ya antes expuesto, se recomienda nutrir al fideicomiso puertorriqueño con "la flexibilidad que caracteriza al *trust* anglosajón y atemper[ar] nuestra ley abandonando los criterios de rigidez e inmovilidad de la fiducia romana". *Dávila v. Agrait*, supra, pág. 565. Siguiendo este principio, encontramos que cuando se crea un fideicomiso que le concede discreción al fiduciario para el ejercicio de un poder, el tribunal sólo intervendrá con el ejercicio de este poder para evitar un abuso de discreción por parte del fiduciario. 1 *Restatement of the Law of Trusts* Sec. 187, pág. 479, según citado con aprobación en *Belaval v. Tribl. de Expropiaciones*, 71 D.P.R. 265, 275 (1950). "En el del fideicomiso, los bienes que pertenecían al fideicomitente han sido transmitidos al fiduciario, quien tiene todos los derechos y acciones correspondientes al *pleno dominio*, con la única limitación de que el traspaso se hace de acuerdo con lo que haya ordenado el fideicomitente, para beneficio del fideicomisario." (Énfasis en el original.) *Belaval v. Tribl. de Expropiaciones*, supra, pág. 273.

En el caso de autos, el fideicomitente concedió al fiduciario amplios poderes disponiendo, además, "que todas estas facultades pueden ser usadas sin la necesidad de obtener el consentimiento, autorización o permiso de cualquier persona interesad[a] o de corte alguna . . .". Apéndice 3(b), pág. 17. En armonía con los principios expuestos y en virtud de la letra expresa del fideicomiso, no son de aplicación las limitaciones de los Arts. 215 y 1348(3) del Código Civil, *supra*, invocadas por el Registrador de la Propiedad.[19]

## V

*Compra por el fiduciario de bienes fideicomitidos*

El Registrador de la Propiedad señala que el señor Kogan Huberman, como fiduciario de los fideicomisos Brian Kogan y Allison Kogan, no podía adquirir los bienes pertenecientes a dichos fideicomisos. Indica, además, que la cláusula del fideicomiso que faculta al fiduciario a *comprar*, permutar o de cualquier manera disponer de *todo o parte del*

---

[19] Además del planteamiento antes expuesto, el Registrador de la Propiedad señaló como posible falta que no se demostró que la venta se hubiese hecho en interés y beneficio de los respectivos fideicomisarios. En relación con dicho señalamiento, hay que tener presente que el fideicomiso es "un encargo o comisión de confianza". R.J. Alfaro, *Adaptación del trust del derecho anglosajón al derecho civil*, La Habana, Acad. Interam. de Der. Comp. e Inter., 1948, págs. 55–56, según citado en *Dávila v. Agrait*, 116 D.P.R. 549, 555 (1985).

Conjuntamente con lo anterior, debemos señalar que al momento de la compraventa todos los fideicomisarios eran mayores de edad y ninguno ha cuestionado que la compraventa no se hiciese para su interés y beneficio. De no haber sido esa la situación, es probable que lo más deseable a los fines de proteger los intereses de todas las partes hubiera sido solicitar autorización judicial, dada la multiplicidad de roles con que comparece el señor Kogan Huberman: comprador, heredero vendedor, mandatario, vendedor en representación de los fideicomisarios, padre de dos (2) de ellos y persona responsable de que los bienes se vendieran por una "adecuada y plena consideración en dinero o su equivalente". Véanse: *Ferré v. Registrador*, 109 D.P.R. 148 (1979); *Pabón v. Registrador*, 75 D.P.R. 463 (1953); *Ex parte Montalvo*, 70 D.P.R. 462 (1949); *Lebrón v. Registrador*, 63 D.P.R. 359 (1944); *Sucrs. de A. Alfonso, S. en C. v. Registrador*, 59 D.P.R. 785 (1942).

*corpus* o el ingreso de los fideicomisos por una adecuada y plena consideración en dinero o su equivalente, es contraria a derecho. No le asiste la razón. El fiduciario tiene, en relación con los bienes fideicomitidos, todos los derechos y acciones correspondientes al pleno dominio, pero no puede enajenar o gravarlos *"a menos que para ello tenga autorización expresa . . ."*. (Énfasis suplido.) Art. 865 del Código Civil, 31 L.P.R.A. sec. 2572. El fideicomitente, a su vez, puede otorgarle al fiduciario amplios y abarcadores poderes para la disposición de dichos bienes. De otra parte, el fiduciario no podrá disponer "de los bienes fideicomitidos en forma contraria o distinta a la establecida en el fideicomiso". Art. 866 del Código Civil, 31 L.P.R.A. sec. 2573. Para impedir abusos por parte del fiduciario, el fideicomitente, los fideicomisarios o el fiscal pueden pedir su destitución si existiese conflicto de intereses, mala administración o si éste se incapacita.[20]

---

[20] *"Sec. 2574. Destitución del fiduciario*

"Por orden del tribunal con jurisdicción competente se destituirá de su cargo al fiduciario:

"1. Si sus intereses personales son incompatibles con los del fideicomisario;

"2. Si malversa o fraudulenta o negligentemente administra los bienes fideicomitidos;

"3. Si se incapacita o inhabilita.

"La destitución del fiduciario puede solicitarse por el fideicomitente, por el fideicomisario o por el fiscal, este último en defensa de menores de edad o de personas incapacitadas para administrar sus bienes, o a nombre de la ley o de la moral pública." Art. 867 del Código Civil, 31 L.P.R.A. sec. 2574.

*"Sec. 2565 Procedimientos sumarios por el fideicomitente.*

"El fideicomitente podrá solicitar en procedimientos sumarios:

"1. Las medidas de precaución que fuesen necesarias en caso de que aparezca que en manos del fiduciario sufren pérdida o menoscabo los bienes fideicomitidos;

"2. El nombramiento de fiduciario sustituto si se hiciere imposible continuar la ejecución del fideicomiso por razón de incapacidad, destitución o muerte de fiduciario cuyo sustituto no se hubiere previsto;

"3. La destitución del fiduciario cuando los intereses personales de éste sean opuestos a los del fideicomisario, o cuando malgaste o fraudulenta o maliciosamente administre los bienes fideicomitidos, o cuando se incapacite o inhabilite;

"4. La terminación del fideicomiso y restitución de los bienes fideicomitidos cuando el fideicomiso termine por motivo de cualquiera de las condiciones enume-

■ Una de las responsabilidades fundamentales de los fiduciarios es la de mantener una lealtad absoluta a los intereses de los fideicomisarios durante su administración. G. Bogert, *The Law of Trusts & Trustees*, 2da ed., Minnesota, Ed. West Publishing Co., 1978, Sec. 542, págs. 197–198. Entre estos deberes está el de no comprar para sí, privadamente o en pública subasta, los bienes fideicomitidos. Sin embargo, en ausencia de legislación que expresamente prohíba la autocontratación (*self-dealings*) —Bogert, *op. cit.*, Sec. 543, pág. 210— el fideicomitente puede incluir en el contrato de fideicomiso una cláusula que permita tal venta. Ibíd., Sec. 543(a), págs. 237–238. Véanse, también: *In re Krause's Estate*, 172 N.W.2d 468 (1969); *Walters v. Wannemacher*, 217 N.E.2d 695 (1964); Nota, *Validity and Construction of Trust Provision Authorizing Trustee to Purchase Trust Property*, 39 A.L.R.3d 836 (1971).

En el caso de autos, el fideicomitente confirió en el fideicomiso amplios y abarcadores poderes al fiduciario para vender los bienes del fideicomiso. La única restricción que impuso en relación con la venta de los bienes fideicomitidos fue que ésta no podía hacerse "*por menos de una adecuada y plena consideración en dinero o su equivalante*". (Énfasis suplido.) Apéndice 3(b), pág. 17. También confirió amplia facultad "a los fiduciarios, o a cualquiera persona, a comprar, permutar, o en cualquier otra forma disponer de todo o parte del corpus o el ingreso de los fideicomisos . . .". Ibíd. La única limitación fue igualmente que no podía ser "*por menos de una adecuada y plena consideración en dinero o su equivalente*". (Énfasis suplido.)[21]

---

radas en la sec. 2559 de este título." Art. 858 del Código Civil, 31 L.P.R.A. sec. 2565.

[21] Cláusula cinco (5) de la Escritura de Constitución de Fideicomisos, Apéndice 3, pág. 17.

▮▮▮▮ En síntesis, podemos señalar que, tomando en consideración los expresos y amplios poderes de disposición y compra concedidos al fiduciario, y ante la ausencia en el fideicomiso de limitaciones específicas sobre este particular, la intención del fideicomitente a tales efectos fue clara y concreta. Por lo tanto, no debe inferirse la prohibición de la autocontratación. Hacerlo equivaldría a injustificadamente interrumpir el libre flujo del tráfico territorial que tanto afecta los derechos de los herederos y el sistema económico. S. Torres Peralta, *Los derechos inscribibles en el Registro de la Propiedad*, 48 (Núm. 1) Rev. C. Abo. P.R. 15 (1987). Las limitaciones al tráfico económico le competen a la Rama Legislativa.

## VI

*La extinción del fideicomiso*

▮▮▮▮ Finalmente, señala el Registrador de la Propiedad como probable falta que es posible que cuatro (4) de los cinco (5) fideicomisos se hayan extinguido por tener veinticinco (25) años o más los fideicomisarios.[22] Art. 852 del Có-

---

[22] Los recurrentes cuestionan la facultad del Registrador de la Propiedad para presentar por primera vez en su alegato ante este Tribunal el referido impedimento. Apoyan su planteamiento conforme a las disposiciones de los Arts. 69, 71 y 77 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. secs. 2272, 2274 y 2280, y lo resuelto en *Colón & Cía. Inc. v. Registrador*, 88 D.P.R. 79 (1963); *Ferré v. Registrador*, supra, y *Fajardo Cabassa v. Registrador*, 98 D.P.R. 1987 (1969).

Como regla general seguiremos esta norma. Sin embargo, cuando las circunstancias específicas lo ameriten, consideraremos el asunto.

Bajo la vigencia de la anterior Ley Hipotecaria señalamos que "[l]a jurisdicción gubernativa de este Tribunal, a falta de una Dirección General de Registros con esa facultad, es de amplia competencia para una vez el recurso esté propiamente ante nuestra consideración, conocer de y resolver de un todo el conflicto registral, ilustrando tanto al recurrente como al Registrador sobre cuál sea el curso registral correcto de los documentos pendientes de inscripción. Con ese método preceptivo aligeramos la solución total de la discrepancia, le impartimos eficacia a nuestra intervención; y nada malo hay en que evitemos una segunda o

digo Civil, 31 L.P.R.A. sec. 2559. Arguye que de acuerdo con las cláusulas tercera y octava del documento, los fideicomisos estarán vigentes hasta la fecha en que cada uno de los fideicomisarios llegue a la edad de veinticinco (25) años y entonces los bienes fideicomitidos pasarán a dichos beneficiarios sin limitación de clase alguna. Una vez extinguidos los fideicomisos, los fiduciarios estaban impedidos de comparecer en calidad de tales al otorgamiento de la escritura de compraventa en cuestión.

▮ El primer inciso del Art. 852 del Código Civil, *supra*, señala como causa de extinción el cumplimiento de los fines para los cuales se constituyó. En el caso de autos, la cláusula tercera del documento expresamente establece que "[l]os cinco (5) fideicomisos se constituyen por el término comprendido entre esta fecha y la fecha en cuanto a cada respectivo fideicomiso, en que cada uno de los fideicomisarios llegue a la edad de veinticinco (25) años". Apéndice 3, págs. 16–17. La cláusula octava, a su vez, dispone que "[s]egún los beneficiarios vayan cumpliendo la edad expresada en la cláusula número Tres, los bienes fideicomitidos pertenecientes a cada fideicomiso respectivamente, así como cualquier ingreso acumulado de los mismos . . . pasarán a dichos beneficiarios *sin limitación de clase alguna* . . .". (Énfasis suplido.) Apéndice 3, pág. 18.

Los fideicomisos en el caso de autos se constituyeron el día primero de septiembre de 1965 y la escritura de compra-

---

tercera confrontación entre parte y Registrador. . . . [E]l Tribunal considerará en todos sus aspectos las cuestiones planteadas, si existen circunstancias especiales que lo ameritan". *Housing Inv. Corp. v. Registrador*, 110 D.P.R. 490, 501 (1980).

En el presente caso, la magnitud de la falta señalada por primera vez en el alegato del Registrador de la Propiedad, conlleva la nulidad del instrumento. El incumplimiento por parte del notario autorizante de su deber de cerciorarse de la capacidad de todas las partes, permitió el otorgamiento de una escritura nula por falta de consentimiento. Era necesaria la unanimidad de todos los herederos. Estas circunstancias ameritan nuestra intervención.

venta objeto de este recurso se otorgó el 17 de mayo de 1985. El tiempo transcurrido entre uno y otro es, según surge de los documentos incluidos en el recurso, de aproximadamente diecinueve (19) años con ocho (8) meses y dieciséis (16) días. De acuerdo con el párrafo segundo de la exposición del fideicomiso (Apéndice 3, pág. 14), los nombres y edades de los fideicomisarios para esa fecha eran:

| | |
|---|---|
| Brian Kogan | – 5 años |
| Allison Kogan | – 2 años |
| Stephanie Borus | – 8 años |
| Karen Borus | – 6 años |
| David Borus | – 5 años |

Mediante el uso de un simple cálculo matemático, indiscutiblemente para la fecha en que se otorgó la escritura de compraventa, Stephanie Borus y Karen Borus ya habían cumplido los veinticinco (25) años. Brian Kogan y David Borus por su parte, dependiendo de la fecha de nacimiento, es posible que también tuvieran la referida edad. De ser así, el único fideicomiso que quedaba vigente para esa fecha era el de Alison Kogan. No cabe duda de que le asiste la razón al Registrador de la Propiedad en cuanto a la extinción de por lo menos dos (2) de los fideicomisos.

Ante tal situación, es de aplicación el precepto que ordena que nadie "puede contratar a nombre de otro sin estar por éste autorizado o sin que tenga por la ley su representación legal [y que el] contrato celebrado a nombre de otro por quien no tenga su autorización o representación legal será nulo, a no ser que lo ratifique la persona a cuyo nombre se otorgue . . .". Art. 1211 del Código Civil, 31 L.P.R.A. sec. 3376.

A la luz de lo antes señalado, en el caso de autos todas las personas con derecho a autorizar la enajenación del bien inmueble de la comunidad hereditaria no comparecie-

ron por sí o mediante representante debidamente autorizado. Bajo tales circunstancias, no existe la unanimidad necesaria del consentimiento de los herederos para poder vender un bien específico de la comunidad hereditaria. En ausencia de esto, la escritura de compraventa no es inscribible.

## VII

*Un contrato anulable ratificable y su acceso al Registro de la Propiedad*

En materia de contratación, no se concede eficacia a instrumento alguno en el cual, además del objeto y causa, no conste el consentimiento de las partes contratantes.[23] No obstante, al momento de perfeccionarse el contrato dicho consentimiento puede prestarse mediante un tercero, quien comparece en representación del principal. La validez de su actuación dependerá de la existencia de un mandato y, en ausencia de éste, de su posterior ratificación.[24]

El mandato puede ser expreso o tácito. El expreso puede darse por instrumento público o privado y aun de palabra. La aceptación puede ser también expresa o tácita, deducida esta última de los actos del mandatario. Art. 1601 del Código Civil, 31 L.P.R.A. sec. 4422.[25] Independientemente de cómo se haga, cuando se intenta que el contrato

---

[23] El Art. 1213 del Código Civil, 31 L.P.R.A. sec. 3391, dispone:
"No hay contrato sino cuando concurren los requisitos siguientes:
"(1) Consentimiento de los contratantes.
"(2) Objeto cierto que sea materia del contrato.
"(3) Causa de la obligación que se establezca."

[24] El Art. 1211 del Código Civil, 31 L.P.R.A. sec. 3376, dispone:
"Ninguno puede contratar a nombre de otro sin estar por éste autorizado o sin que tenga por la ley su representación legal.
"El contrato celebrado a nombre de otro por quien no tenga su autorización o representación legal será nulo, a no ser que lo ratifique la persona a cuyo nombre se otorgue antes de ser revocado por la otra parte contratante."

[25] Sobre las diferentes clasificaciones del mandato, véase *Zarelli v. Registrador*, 124 D.P.R. 543 (1989).

así otorgado tenga acceso al Registro de la Propiedad, por disposición de ley el notario debe requerir los documentos que acrediten la capacidad del tercero para contratar a nombre de otro.(26)

Al así hacerlo, cumple con su función de primer calificador y evita que el documento sea rechazado por el Registrador de la Propiedad. Éste hará la calificación final. "Es unánime la doctrina de que el principio de legalidad vigente en nuestro ordenamiento hace necesaria la calificación registral, a fin de que solamente logren acceso al Registro títulos válidos y perfectos." *U.S.I. Properties, Inc. v. Registrador*, 124 D.P.R. 448 (1989). Véanse, además: *P.R. Prod. Credit Assoc. v. Registrador*, 123 D.P.R. 231 (1989); *L. Dershowitz & Co., Inc. v. Registrador*, 105 D.P.R. 267, 273 (1976). La no presentación de los documentos que acrediten facultades para representar a otros en el otorgamiento de documentos es falta que impide la inscripción. A. González Román, *Algunos aspectos de la calificación registral en el artículo 68 de la Ley Hipotecaria y del Registro de la Propiedad de 1979*, 50 Rev. Jur. U.P.R. 221, 228 (1981).

Recientemente, en *In re Feliciano Ruiz*, 117 D.P.R. 269, 278 (1986), ante una controversia sobre si en un negocio jurídico había habido o no mandato, señalamos que en una situación como esa "no queda excluida la posibilidad de ratificación, pues un acto concluido sin poder es anulable. De ratificarse, se superaría el problema documental aludido,

---

(26) El Art. 19 de la Ley Notarial de Puerto Rico, 4 L.P.R.A. sec. 2037, dispone, en lo pertinente:

"Todo otorgante que comparezca en representación de otra persona deberá siempre acreditar ante el notario su designación con los documentos fehacientes, salvo que exista la conformidad expresa de los otorgantes. La eficacia plena de la escritura quedará subordinada a la presentación de prueba documental de la representación alegada."

incluso su suficiencia para la eventual entrada de las escrituras al Registro de la Propiedad".

■ Giménez Arnau, por su parte, nos dice que "[e]l que actúa con poder bastante pero no acreditado, concluye un acto con fuerza vinculante para el representado; pero el acto no es perfecto. En cierto modo está pendiente de que se acredite la suficiencia y existencia del poder; viene a ser como un negocio jurídico incompleto, por lo menos en cuanto a la forma ya que la plenitud de efectos sólo se produce con la superposición al documento concluido u otorgado por representación de aquel otro que justifique la capacidad del otorgante para actuar a nombre ajeno". E. Giménez Arnau, *Derecho Notarial*, Pamplona, Ed. U. de Navarra, 1976, pág. 549. Agrega, además, que "en el acto concluido *sin poder*, o *con poder insuficiente* no hay un acto nulo, sino simplemente anulable, porque se puede confirmar por el titular en virtud de la ratificación". (Énfasis suplido.) Giménez Arnau, *op. cit.*, pág. 549.

■ De acuerdo con lo antes citado, cualquiera que sea el modo en que comparezca un representante, el documento siempre podría lograr eficacia y acceso al Registro de la Propiedad. Precisamente, según indica el citado autor, "[u]na de las formas de dar eficacia a un instrumento público autorizado sin que se justificara la representación (*representación no acreditada*) o sin que la representación existiera (*comparecencia sin poder de representación*) o excediéndose en el uso de las facultades recibidas (*exceso o abuso de poder*) es la ratificación; negocio jurídico de carácter unilateral que tiene por finalidad la de aprobar y dar efectos *ex post facto*, por la manifestación de voluntad del *dominus negotii*, al negocio jurídico que otra persona concluyó en su nombre, sin poder, o con poder insuficiente". Giménez Arnau, *op. cit.*

De acuerdo con lo antes expuesto, en la medida en que Myrna Kogan Huberman, al comparecer como fiduciaria

vendedora en representación de los fideicomisos Stephanie Borus, Karen Borus y David Borus, y Lawrence Kogan Huberman —al comparecer como fiduciario vendedor en representación de los fideicomisos Brian Kogan y Allison Kogan, y como mandatario de la Sra. Aida Huberman— hayan obrado sin poder o con poder insuficiente,[27] o se hayan excedido en sus facultades, la escritura de compraventa no será inscribible en el Registro de la Propiedad hasta que los representados ratifiquen las actuaciones de sus representantes.[28]

Por los fundamentos antes expuestos, *se dictará sentencia confirmando la Nota Denegatoria del Registrador de la Propiedad, Sección Tercera de San Juan, sin perjuicio de que conforme a las disposiciones de la Ley Hipotecaria, los interesados ratifiquen, si así lo desean, dentro del término de vigencia de la correspondiente anotación preventiva, la escritura de compraventa.*

El Juez Asociado Señor Negrón García emitió voto concurrente y de conformidad. El Juez Asociado Señor Rebollo López emitió voto concurrente. El Juez Asociado Señor Ortiz no intervino.

---

[27] Véase esc. 18.

[28] Reglamento General para la Ejecución de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2003–89.6, edición especial:

"Al recibir la notificación sobre la interposición del recurso gubernativo, el Registrador extenderá nota al margen de la anotación preventiva de denegatoria, expresando el número del recurso, el hecho de la interposición del mismo, nombre del recurrente, y haciendo constar que por este motivo los efectos legales de esta anotación preventiva subsistirán hasta 60 días después de que se tome razón en el Registro de la resolución que recaiga, la fecha y firma del Registrador."

Reglamento General, *supra*, 30 L.P.R.A. sec. 2003–90.2:

"La nota al margen de la anotación preventiva contendrá la fecha de la resolución del Tribunal Supremo, número del recurso, el hecho de que el Tribunal desestimó el recurso instado, por lo que el interesado tiene 60 días a partir de la fecha de la resolución para cumplir con los requisitos necesarios para la conversión de la nota denegatoria en inscripción definitiva, fecha y firma del Registrador."

—O—

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López.

## I

Como es sabido, nuestra Ley de Fideicomiso(1) fue copiada casi *ad verbatim* de la ley de fideicomiso de la República de Panamá, la cual, a su vez, fue adoptada, con ciertas variaciones, de un anteproyecto preparado por el jurista panameño Ricardo J. Alfaro. Ello no obstante, en *Dávila v. Agrait*, 116 D.P.R. 549, 565 (1985), expresamos, en lo pertinente, que:

A modo de compendio, nuestra adaptación de la ley panameña de fideicomisos no creó un todo coherente e integrado a perfección. Nuestra ley tiene zonas grises, lagunas y vacíos. Hasta tanto se legisle sobre el particular, esas deficiencias no se atienden adhiriéndonos exclusivamente al respetable pensamiento de Alfaro. La lección es clara. La creación del fideicomiso puertorriqueño tomó como punto de partida la obra del ilustre panameño, *mas la intención central fue incorporar a nuestro ordenamiento jurídico, con ajustes, el trust anglosajón. Esta innegable realidad sirve de guía. Es hacia las características de éste donde hay que acudir para resolver, con debido respeto a nuestra tradición civilista, muchas de las interrogantes que plantea nuestra Ley Núm. 41 de Fideicomisos de 23 de abril de 1928*. (Énfasis suplido.)

La doctrina referente al *trust* anglosajón no ve "con buenos ojos" la compra de bienes pertenecientes al fideicomiso por parte del fiduciario. Se reconoce la validez de dicha transacción *únicamente* cuando ello es *autorizado por estatuto* o cuando el fideicomitente, *de manera expresa*, autoriza la misma al crear el fideicomiso. G. Bogert, *The Law of*

---

(1) Ley Núm. 41 de 23 de abril de 1928, la cual fue enmendada por la Ley Núm. 211 de 8 de mayo de 1952 (31 L.P.R.A. secs. 2541–2581).

678

*Trusts & Trustees*, 2da ed., Minnesota, Ed. West Publishing Co., 1978, Sec. 543(A), págs. 234–239; *In re Krause's Estate*, 172 N.W.2d 468 (1969). Este requisito de que la compra de bienes del fideicomiso por parte del fiduciario tiene que ser *autorizado en forma expresa* por el fideicomitente no sólo es requerido por la doctrina anglosajona, sino que es uno exigido por la doctrina civilista en relación con la figura del "autocontrato". Véanse: L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. I, pág. 128;(2) D. Espín Cánovas, *Manual de Derecho Civil Español*, 4ta ed., Madrid, Ed. Rev. Der. Privado, 1975, Vol. III, pág. 392.

En nuestra jurisdicción *no* existe disposición legal que autorice dicha transacción. Por el contrario, en nuestro Código Civil existen unas disposiciones que expresamente impiden al fiduciario comprar bienes pertenecientes al fideicomiso.

Dispone el Art. 859 del Código Civil, 31 L.P.R.A. sec. 2566, en lo pertinente, que "[e]l fiduciario y su sustituto, si son personas naturales, deberán tener todos los requisitos y condiciones que la ley exige a los tutores".

Por otro lado, establece el Art. 215(3) del Código Civil, 31 L.P.R.A. sec. 789, en lo pertinente, que:

---

(2) Expresa Díez-Picazo, en lo pertinente, que:

". . . 1.ª El poder o autorización para autocontratar. Si el principal permite a su representante que autocontrate ningún reparo puede serle opuesto al negocio. *El poder para autocontratar debe ser expreso y no puede entenderse inducido por medio de una interpretación de las cláusulas de un poder general.* Al supuesto de autorización previa para autocontratar debe equipararse la aceptación del autocontrato que el principal, conociéndolo, haga de lo realizado por su representante. Esta aceptación (ratificación) puede ser expresa o táctita. 2.ª La eliminación del conflicto de intereses. El segundo de los supuestos de validez del autocontrato se da en todos aquellos casos en que de su celebración no se siga lesión o perjuicio del interés del representado." (Énfasis suplido.) L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. I, págs. 128–129.

Se proh[í]be a los tutores:

(3) Comprar por sí o por medio de otra persona, los bienes del menor o incapacitado, a menos que expresamente hubiesen sido autorizados para ello por el Tribunal Superior.

El Art. 1348(1) del Código Civil, 31 L.P.R.A. sec. 3773(1), por su parte dispone, en lo pertinente, que:

No podrán adquirir por compra, aunque sea en subasta pública o judicial, por sí ni por persona alguna intermedia:

(1) El tutor, los bienes de la persona o personas que están bajo su tutela.

No debe haber duda alguna, en consecuencia, sobre el hecho de que en nuestra jurisdicción en *la única situación* en que un fiduciario puede adquirir bienes del fideicomiso es cuando el fideicomitente, en la escritura de constitución del fideicomiso, *expresamente así lo autoriza.*

Un examen de la escritura sobre constitución de fideicomiso aquí en controversia[3] revela que los fideicomitentes *no autorizaron de manera expresa a los fiduciarios a comprar los bienes pertenecientes al fideicomiso.*[4] No es entera-

---

[3] Escritura Núm. 160 de fecha 1ro de septiembre de 1965, otorgada ante el Notario Genovevo Meléndez Carrucini.

[4] La Cláusula quinta de la referida escritura pública dispone:
"---Cinco: Los fiduciarios, o la persona que les sustituyeren, tendrán las siguientes facultades en relación con los bienes o fondos fideicomitidos para beneficio de los beneficiarios o fideicomisarios, sujetas, sin embargo, dichas facultades a lo provisto en la Ley.
---Para administrar dichos bienes, guardarlos, tenerlos, retenerlos, gravarlos, invertir y reinvertir lo que produzcan; disponer de ellos así como de cualquiera otra propiedad, o cualesquiera otros bienes o ingresos que puedan ser agregados a los mismos o que los mismos produzcan; para usar sus rentas, ingresos y ganancias de capital como resultado de la venta, conversión, disposición, liquidación o permuta; para tomar dinero a préstamos con garantía de valores, y para hacer todos aquellos actos que pudieren realizar si los bienes fueren propios, incluyendo la facultad de comparecer en escrituras públicas; dar recibos, abrir cuentas de banco y expedir cheques y hacer imposiciones sobre las mismas; otorgar pagarés y otras obligaciones; celebrar contratos; comparecer ante los tribunales de justicia o ante juntas y agencias administrativas; otorgar cancelaciones de hipotecas y constituir cualquier clase de gravámenes; para adquirir acciones, bonos y certifi-

mente correcta la aseveración hecha en la opinión mayoritaria, pág. 669, a los efectos de que:

> En el caso de autos, el fideicomitente confirió en el fideicomiso amplios y abarcadores poderes al fiduciario para vender los bienes del fideicomiso. La única restricción que impuso en relación con la venta de los bienes fideicomitidos fue que ésta no podía hacerse *"por menos de una adecuada y plena consideración en dinero o su equivalente"*. (Énfasis suplido.) Apéndice 3(b), pág. 17. También confirió amplia facultad "a los fiduciarios o a cualquiera persona, a comprar, permutar, o en cualquier otra forma disponer de todo o parte del corpus o el ingreso de los fideicomisos . . .". Ibíd. La única limitación fue igualmente que no podía ser *"por menos de una adecuada y plena consideración en dinero o su equivalente"*. (Énfasis suplido.)

Como surge de una lectura de la parte final de la cláusula quinta de la mencionada escritura pública Núm. 160 —transcrita en su totalidad en el esc. 4, ante— la aseveración de la

---

cados de corporaciones o participaciones en sociedades y otras entidades; ejercitar el derecho al voto de las acciones fideicomitidas o de las que adquieran en el futuro; suscribir acciones de corporaciones y aportar bienes o capital en sociedades y entidades, concertar transacciones, incoar pleitos y proseguirlos hasta su resolución definitva, o transigirlos, entendiéndose, que todas estas facultades pueden ser usadas sin la necesidad de obtener el consentimiento, autorización o permiso de cualquier persona interesado o de corte alguna, y no obstante pueden ellos también estar actuando individualmente, o como fiduciaria de otros fideicomisos, o como agentes de otras personas naturales o jurídicas interesadas en los mismos asuntos o pueden estar interesadas en relación con los mismos asuntos como accionistas, directores o en otra forma, entendiéndose, sin embargo, que ellos ejercerán todos dichos poderes en todo momento en una capacidad fiduciaria principalmente y solamente en el interés y para beneficio de los respectivos fideicomisarios, y entendiéndose, además, que la fiduciaria, o quienes los sustituyeren, no serán responsables por ningún error de juicio o por ninguno de sus actos, a menos que en sus actuaciones hayan obrado deliberadamente de mala fe. *No obstante, cualquier disposición de este instrumento en contrario, ninguno de los poderes aquí enumerados o conferidos a la fiduciaria o fiduciario serán interpretados en el sentido de facultar a los fiduciarios, o a cualquiera persona, a comprar, permutar, o en cualquiera otra forma disponer de todo o parte del corpus o el ingreso de los fideicomisos por menos de una adecuada y plena consideración en dinero o su equivalente."* (Énfasis suplido.) Apéndice 3(b), págs. 16–17.

mayoría, pág. 669, a los efectos de que "[t]ambién [el fideicomitente] confirió amplia facultad 'a los fiduciarios, o a cualquiera persona, a comprar, permutar, o en cualquier otra forma disponer de todo o parte del corpus o el ingreso de los fideicomisos'" *es una sacada fuera de contexto de dicha Cláusula Quinta, actuación, o interpretación de la mayoría que tiene el efecto de causar la impresión errónea de que al fiduciario Kogan Huberman se le concedió la facultad expresa de comprar los bienes del fideicomiso cuando ello, realmente, no es así.*

Resulta, en consecuencia, jurídicamente incorrecto lo expresado en la Parte IV de la opinión mayoritaria emitida, págs. 666–667, a los efectos de que a "la luz de los hechos particulares de este caso" y "en virtud de la letra expresa del fideicomiso, no son de aplicación las limitaciones de los Arts. 215 y 1348(3) del Código Civil, *supra*, invocadas por el Registrador" de la Propiedad; los cuales artículos de ley como hemos visto, en virtud de las disposiciones del Art. 859 del referido Código Civil, *supra*, hacen extensiva al fiduciario la *prohibición expresa* que impide al tutor comprar los bienes del menor incapaz. En otras palabras, el fiduciario Lawrence Kogan Huberman *no* tenía autoridad para realizar la transacción de compra y venta de los bienes pertenecientes al fideicomiso, la inscripción de la cual correctamente objetó el Registrador recurrido.

## II

No obstante lo erróneo de los fundamentos aducidos en la opinión mayoritaria, según ello ha quedado demostrado anteriormente, concurrimos con el resultado a que se llega en la opinión mayoritaria emitida por cuanto la transacción realizada por el fiduciario en el presente caso es una meramente "anulable", a diferencia de una inexistente o radicalmente nula, *Zayas v. Orraca*, 80 D.P.R. 339, 352 (1958), y, por lo tanto, una ratificable por los fideicomisarios o beneficiarios del fideicomiso. Véanse, en adición: *Silva Hno. y Cía. v. El*

*Reg. de San Juan, Sec. 1a,* 28 D.P.R. 177, 181 (1920); *Álvarez v. Riera,* 20 D.P.R. 324, 326 (1914); *Ledesma et al. v. Agrait et al.,* 19 D.P.R. 566, 576 (1913); F. García Goyena, *Concordancias, motivos y comentarios del Código Civil español,* Zaragoza, Ed. Cometa, 1974, pág. 734.

En su consecuencia, no obstante proceder la confirmación de la Nota Denegatoria emitida por el Registrador recurrido, resulta igualmente procedente devolver el asunto para permitir que todos los beneficiarios, *si así lo desearen hacer,*[5] ratifiquen la transacción en controversia dentro del término de vigencia de la anotación preventiva.

—O—

Opinión concurrente y de conformidad del Juez Asociado Señor Negrón García.

Ha señalado Acdeel Ernesto Salas, en ocasión de prologar la obra de Masnatta sobre la autocontratación, "que es menester aceptar la solución que mejor satisfaga las exigencias sociales y económicas del tráfico jurídico; pero . . . conviene precisar que la solución debe darse dentro del marco de la ley —que siempre es garantía contra la arbitrariedad— y que lo económico debe entenderse en función de lo social". H. Masnatta, *La Autocontratación,* Buenos Aires, Ed. Depalma, 1965, pág. 8. Es precisamente el espíritu de esta máxima jurídica lo que inspira nuestros pronunciamientos.

---

[5] Como expresáramos en *Millán v. Caribe Motors Corp.,* 83 D.P.R. 494, 504 (1961):

"La nulidad relativa o la anulabilidad opera en favor de las personas que han cometido un error o contra las cuales se ha utilizado violencia, intimidación o dolo. La mejor forma de hacer efectiva esta protección no es declarando nulo el acto, porque tal remedio podría exceder su objetivo, sin[o] subordinar su mantenimiento a la voluntad del interesado. Si éste encuentra que el contrato es ventajoso, lo puede confirmar; [si no], puede solicitar su anulación. Castán, *Derecho Civil Español,* 8a. ed., 1954, tomo 3, págs. 437–446; Puig Brutau, *Fundamentos de Derecho Civil,* tomo 2, vol. 1, págs. 322–332; Guaroa Velázquez, *Obligaciones y Contratos,* mimeógrafo de la Universidad de P.R., 1939, págs. 113–116; *Zayas v. Orraca,* 80 D.P.R. 339, 351 (1957)."

## I

El autocontrato, contrato consigo mismo, autoacto o, como con mayor precisión lo llaman otros, *acto jurídico consigo mismo*, es una figura que después de muchas controversias ha ganado espacio en el ordenamiento jurídico. Sin embargo, todavía no hay unanimidad de criterios en cuanto a su naturaleza jurídica y alcance. Las principales objeciones han sido: su posibilidad jurídica; *la posible colisión de intereses*; la ausencia de dos (2) personas y dos (2) voluntades, requisito de todo contrato, y la falta de exteriorización de ambas voluntades cuya declaración, susceptible de prueba, liga a las partes. Masnatta, *op. cit.*, págs. 23–36; A. de Rovira Mola, *Contrato Consigo Mismo*, en C. Mascareñas, *Nueva Enciclopedia Jurídica*, Barcelona, Ed. Seix, 1952, T. V, págs. 383–392.

## II

Aparte de los problemas que por sí solo pueda suscitar el autocontrato, su coexistencia en el caso de autos con otros institutos jurídicos, como el mandato y el fideicomiso, nos obliga a exhibir una gran cautela en la adjudicación de esta controversia.

El Registrador de la Propiedad se ha negado a inscribir la escritura en que el recurrente, Lawrence Kogan Huberman, comparece en varias capacidades a la compraventa de una finca perteneciente a una comunidad hereditaria. Además de figurar como parte compradora, comparece como parte vendedora en representación de la cónyuge supérstite (mediante mandato),[1] como fiduciario de dos (2) fideicomisos y por sí mismo como heredero copropietario.

---

[1] La compraventa se efectuó el 17 de mayo de 1985. Posteriormente, el 5 de febrero de 1986, Aida Huberman Ingerson ratificó el negocio. De esta manera se quizo superar cualquier violación al Art. 1348(2) del Código Civil, 31 L.P.R.A. sec. 3773(2), que prohíbe la compra por el mandatario de los bienes de cuya adminis-

De acuerdo con el Registrador de la Propiedad, no es inscribible la compraventa del bien específico perteneciente a la sucesión hereditaria porque éste no se había adjudicado antes en la correspondiente partición. Apoya su aserto en lo dispuesto por el Art. 95 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2316, y por el Art. 102.1 del Reglamento General para la Ejecución de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2003–102.1, edición especial.(2)

No tiene razón el Registrador de la Propiedad. Como bien analiza y fundamenta la opinión mayoritaria, no existe impedimento jurídico para que los miembros de una comunidad hereditaria, actuando en común acuerdo, puedan enajenar un bien específico sin efectuar previamente la partición.

Antes de la partición el derecho de cada heredero es abstracto, por lo que éstos no pueden disponer libremente de su *cuota* sobre bienes concretos y determinados. *Osorio v. Registrador*, 113 D.P.R. 36 (1982). Sin embargo, sí pueden disponer de su cuota en la herencia en bloque y nada impide que

---

tración o enajenación estuviesen encargados. Creemos que en las circunstancias del presente caso la ratificación no era necesaria. Se ha reconocido que aunque "[e]n el Código Civil se proh[í]be que el mandatario adquiera los bienes de su mandante, mas este principio cede ante el pacto del mandante y del mandatario de que así se haga. *Modus et conventio vincunt legem*". *Fernández v. Laloma*, 56 D.P.R. 367, 379 (1940).

(2) El Art. 95 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2316, en lo pertinente dispone: "No se inscribirán enajenaciones o gravámenes de cuotas específicas en una finca que no se haya adjudicado antes en la correspondiente partición."

El Art. 102.1 del Reglamento General para la Ejecución de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2003–102.1, edición especial, dispone: "A tenor con lo dispuesto en el artículo 95 de la Ley [30 L.P.R.A. sec. 2316] y la sec. 2003–50.1 de este Reglamento, tanto en la inscripción del derecho hereditario como en la de sentencia de divorcio que pueda inscribirse bajo el artículo 1330 del Código Civil [31 L.P.R.A. sec. 3714], el Registrador hará constar claramente que la finca o derecho donde se inscriba pertenece a un patrimonio indiviso y que no podrán ser trasmitidos o gravados cuota o porciones del dominio sobre la finca o derecho de que se trate, sino por todos los titulares, a menos que haya mediado partición y adjudicación inscrita a favor del transmitente."

todos acuerden disponer bienes específicos. Esta última acción de ninguna manera afecta la herencia, pues el contravalor recibido sustituye los bienes hereditarios dispuestos. Como señala Valencia Zea, "[l]os herederos pueden, de común acuerdo, enajenar efectos hereditarios. Las sumas de dinero u otros bienes que reciban a cambio se subrogan a los enajenados. La subrogación real tiene aplicación en esta materia a fin de conservar la afectación unitaria de todo el patrimonio herencial, cuales son el pago de las deudas hereditarias, los gastos del juicio de sucesión, los impuestos y la posterior adjudicación a los herederos". A. Valencia Zea, *Derecho Civil*, 5ta ed., Bogotá, Ed. Temis, 1980, T. VI, págs. 442–443. La venta de bienes específicos es lo que en muchos casos permite satisfacer adecuadamente las deudas y obligaciones del causante, los gastos de última enfermedad y entierro y los gastos de partición. La propia ley hace viable la solución de esta contingencia.

> *Si no hubiere en la herencia dinero bastante para el pago de funerales y legados, y los herederos no lo aprontaren de lo suyo, promoverán los albaceas la venta de los bienes muebles; y no alcanzando éstos, la de los inmuebles, con intervención de los herederos.*
>
> Si estuviere interesado en la herencia algún menor, ausente, corporación o establecimiento público, la venta de los bienes se hará con las formalidades prevenidas por las leyes para tales casos. (Énfasis suplido.) Art. 825 del Código Civil, 31 L.P.R.A. sec. 2522. Véanse, además: *Vilella v. Registrador*, 36 D.P.R. 795 (1927); *Hernández v. El Reg. de San Juan*, 29 D.P.R. 1010 (1921); M. Albaladejo, *Comentarios al Código Civil y compilaciones forales*, Madrid, Ed. Rev. Der. Privado, 1979, T. XII, Vol. 2, págs. 199–210.

## III

Ahora bien, aunque el negocio perseguido sea viable de acuerdo con nuestro ordenamiento civil, ello no equivale a la ausencia de otras deficiencias que impidan su acceso al Re-

gistro de la Propiedad. Como demostraremos más adelante, estamos frente a un negocio anulable que, como es sabido, no tiene acceso al Registro de la Propiedad. Terminada la vida legal de cuatro (4) de los cinco (5) fideicomisos,[3] Lawrence Kogan carecía de capacidad para llevar a cabo el acto de enajenación en representación de los fideicomisarios. Ello contraviene el Art. 1211 del Código Civil, 31 L.P.R.A. sec. 3376, dispositivo de que "[n]inguno puede contratar a nombre de otro sin estar por éste autorizado o sin que tenga por la ley su representación legal". La validez del negocio, entonces, está supeditada a una posible ratificación por parte de los fideicomisarios.

En cuanto al fideicomiso restante, vigente porque el fideicomisario —Allison Kogan— no ha alcanzado los veinticinco (25) años de edad, es necesario determinar si no existe traba legal o contractual para la adquisición de bienes del fideicomiso por parte del fiduciario.

De entrada, no creemos que bajo el Art. 859 del Código Civil, 31 L.P.R.A. sec. 2566, pueda equipararse al fiduciario —cuando es persona natural— con la figura del tutor, y por ende serle extensiva a aquél la norma de los Arts. 215 y 1348(3) del Código Civil, 31 L.P.R.A. secs. 789 y 3773(3), que impiden que éste compre los bienes del menor o incapaz a menos que así lo autorice el tribunal. La analogía o equivalencia entre ambas figuras se refiere estrictamente a los requisitos y condiciones que deben reunir los fiduciarios, y *no a las prohibiciones en sus actuaciones.*

Aclarado este extremo, notamos que el Art. 865 del Código Civil, 31 L.P.R.A. sec. 2572, dota a Lawrence Kogan de los derechos y acciones correspondientes al pleno dominio,

---

[3] El Art. 853 del Código Civil, 31 L.P.R.A. sec. 2560, dispone que "[l]a vida legal del fideicomiso terminará en la fecha designada por convenio expreso y personal de todas las partes o en la fecha que decrete un tribunal con jurisdicción competente".

pero le exige *autorización expresa* para enajenar o gravar los bienes fideicomitidos. El Art. 866 del Código Civil, 31 L.P.R.A. sec. 2573, por su parte impide que el fiduciario disponga de los bienes fideicomitidos en forma contraria o distinta a la establecida en el fideicomiso.

Esta normativa nos obliga a recurrir al texto de la *escritura de constitución del fideicomiso* para determinar si el negocio se autorizó expresamente y si está conforme a lo allí dispuesto. Su cláusula quinta dispone:

> *Los fiduciarios, o la persona que les sustituyeren, tendrán las siguientes facultades en relación con los bienes o fondos fideicomitidos* para beneficio de los beneficiarios o fideicomisarios, sujetas, sin embargo, dichas facultades a lo provisto en la Ley.
>
> Para administrar dichos bienes, guardarlos, tenerlos, retenerlos, gravarlos, invertir y reinvertir lo que produzcan; *disponer de ellos así como de cualquiera otra propiedad,* o cualesquiera otros bienes o ingresos que puedan ser agregados a los mismos o que los mismos produzcan; para usar sus rentas, ingresos y ganancias de capital como resultado de la venta, conversión, disposición, liquidación o permuta; para tomar dinero a préstamos con garantía de valores, y *para hacer todos aquellos actos que pudieren realizar si los bienes fueren propios, incluyendo la facultad de comparecer en escrituras públicas ... que todas estas facultades pueden ser usadas sin la necesidad de obtener el consentimiento, autorización o permiso de cualquier persona interesado o de corte alguna, y no obstante pueden ellos también estar actuando individualmente, o como fiduciaria de otros fideicomisos, o como agentes de otras personas naturales o jurídicas interesadas en los mismos asuntos* o pueden estar interesadas en relación con los mismos asuntos como accionistas, directores o en otra forma, entendiéndose, sin embargo, que ellos ejercerán todos dichos poderes en todo momento en una capacidad fiduciaria principalmente y solamente en el interés y para beneficio de los respectivos fideicomisarios, y entendiéndose, además, que la fiduciaria, o quienes los sustituyeren, no serán responsables por ningún error de juicio o por ninguno de sus actos, a menos

que en sus actuaciones hayan obrado deliberadamente de mala fe. *No obstante, a cualquier disposición de este instrumento en contrario, ninguno de los poderes aquí enumerados o conferidos a la fiduciaria o fiduciario serán interpretados en el sentido de facultar a los fiduciarios, o a cualquiera persona, a comprar, permutar, o en cualquiera otra forma disponer de todo o parte del corpus o el ingreso de los fideicomisos por menos de una adecuada y plena consideración en dinero o su equivalente.* (Énfasis suplido.) Apéndice 3(b), págs. 16–17.

Esta cláusula "no pued[e] considerarse como un modelo de la mejor construcción jurídica, mas no por eso estamos dispensados de buscar en ell[a] la verdadera voluntad"(4) del otorgante. Si bien esta redacción no utiliza un lenguaje directo, no deja dudas de que permite la compra de los bienes del fideicomiso por parte del fiduciario. El sistema espiritualista que informa nuestro Código Civil nos ha llevado a interpretar que "[d]onde . . . dice *expresamente* ha querido decir *claramente, determinadamente, concretamente, manifiestamente* . . .". (Énfasis en el original.) *Madera v. Metropolitan Const. Corp.*, 95 D.P.R. 637, 648 (1967). Véase *Franco Oins et al. y Jones v. Caneja*, 26 D.P.R. 518, 525 (1918).

El idioma tiene múltiples caminos de expresión, algunos directos y explícitos, otros indirectos y sobreentendidos. Si bien se prefieren los primeros porque hacen más accesible la comunicación, no por ello dejan de ser válidos y efectivos los medios indirectos de comunicar. Una forma aparentemente negativa de afirmar puede en realidad resultar una manera expresiva de señalar una opción, de proponer una alternativa que se puede adoptar siempre que se cumpla con una condición. Tal es el caso de la última oración del fragmento citado de la cláusula cinco (5), que no hace sino establecer una posibilidad de acción perfectamente viable siempre y cuando se

---

(4) *Díaz Lamoutte v. Luciano*, 85 D.P.R. 834, 849 (1962).

atienda a la condición establecida. La adquisición de los bienes[5] de los fideicomisos, bien por los fiduciarios o por extraños, quedó sujeta a la condición de que se satisficiera una adecuada y plena consideración en dinero o su equivalente.

Por estas razones estamos contestes en que procede confirmarse la calificación.

---

[5] Es necesario destacar que el bien inmueble objeto de la compraventa no es propiamente un bien del fideicomiso, sino de una sucesión hereditaria de la cual son miembros varios fideicomisos.