Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| JOSÉ RAMÓN SÁNCHEZ CARRILLO Y OTROS<br><br>Apelados<br><br>v.<br><br>ZENAIDA SÁNCHEZ CARRILLO Y OTROS<br><br>Apelantes | KLAN202200701 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Carolina<br><br>Civil número: CA2019CV01775<br><br>Sobre: Solicitud de Partición; Daños |

Panel especial integrado por su presidente, el juez Bonilla Ortiz, la juez Aldebol Mora[1] y la juez Díaz Rivera[2].

Aldebol Mora, Juez Ponente

# **S E N T E N C I A**

En San Juan, Puerto Rico, a 30 de noviembre de 2023.

Comparece la parte apelante, Zenaida Sánchez Carrillo, Félix González Carrillo y María de los Ángeles García Carrillo, y nos solicitan que revoquemos la *Sentencia* emitida y notificada por el Tribunal de Primera Instancia, Sala de Superior de Carolina, el 29 de junio de 2022. Mediante dicho dictamen, el foro primario declaró Ha Lugar la demanda incoada por la parte apelada, José R. Sánchez Carrillo, Elsa I. González Carrillo y Elba G. González Carrillo, sobre partición hereditaria, solicitud de créditos contra el caudal hereditario, pago de arrendamiento, devolución de los bienes muebles y efectos personales, así como compensación por daños y perjuicios.

Por los fundamentos que exponemos a continuación, se confirma el dictamen apelado.

**I**

El 20 de mayo de 2019,  José R. Sánchez Carillo (José Sánchez), Elsa I. González Carrillo (Elsa González) y Elba G. González Carrillo (Elba

---

[1] Mediante Orden Administrativa OATA-2023-001 de 9 de enero de 2023, se designó a la Hon. Waleska I. Aldebol Mora en sustitución del Hon. Ángel R. Pagán Ocasio.
[2] Mediante Orden Administrativa OATA-2023-116 de 5 de julio de 2023, se designó a la Hon. Karilyn M. Díaz Rivera en sustitución de la Hon. Olga E. Birriel Cardona, quien se acogió a los beneficios del retiro.

González), en adelante parte apelada o apelados, presentaron una demanda en contra de Zenaida Sánchez Carrillo (Zenaida Sánchez), Félix González Carrillo (Félix González) y María de los Ángeles García Carrillo (María García) (apelantes), sobre partición hereditaria, solicitud de créditos contra el caudal hereditario, pago de arrendamiento, devolución de los bienes muebles y efectos personales de estos, así como compensación por daños y perjuicios.[3]

En las alegaciones de la demanda, los apelados indicaron que, Elba Gloria Morales Carrillo (Elba Morales o causante) falleció el 26 de mayo de 2017 en Carolina, Puerto Rico. Adujeron que, a su fallecimiento, Elba Morales se encontraba en estado de viudez y todos sus bienes eran privativos. Alegaron que, previo a su fallecimiento, la causante otorgó un testamento abierto el 28 de enero de 2013 en San Juan, Puerto Rico, ante el notario Antonio Bauzá Torres. En dicho testamento, Elba Morales instituyó como herederos en el tercio de legítima estricta a sus seis (6) hijos en partes iguales; María García, Zenaida Sánchez, José Sánchez, Elba González, Elsa González Carrillo y Félix González Carrillo. De igual forma, indicaron que la causante instituyó como único y universal heredero en el tercio de mejora y libre disposición a su hijo Félix González, al cual designó, además, como albacea.

Según surge de la demanda, los apelados argumentaron que la causante adquirió una propiedad en la urbanización Metrópolis, para la cual asumió una hipoteca que grababa el inmueble por $24,500.00.[4] Sostuvieron que, previo a la compra de dicha propiedad, la causante le indicó a José Sánchez su deseo de que la casa fuese la residencia principal de ambos, ya que este era el único sustento familiar. Sin embargo, señalaron que este último no pudo comparecer a la compraventa de dicha propiedad debido a que se encontraba destacado en el servicio militar en los Estados Unidos. No obstante, propusieron que José Sánchez le envió

---

[3] Apéndice 1 del recurso, págs.1-8.
[4] Íd.

dinero a la causante para que adquiriera el inmueble, así como para el pago de la hipoteca desde el 28 de junio de 1971 hasta el saldo del préstamo hipotecario el 18 de diciembre de 1997.

Por otro lado, alegaron que, aún después de finalizar el pago de la propiedad, el señor José Sánchez continuó asistiendo económicamente a la causante con el pago de sus alimentos, cumpliendo así con su deber como hijo. Afirmaron que José Sánchez posee evidencia de todos los pagos realizados respecto a la propiedad, los cuales ascendían a $57,344.38. Según sostuvieron, dicha cantidad constituía un crédito a favor de este en contra de la Sucesión de Elba Morales.

Los apelados argumentaron que, con el pasar del tiempo, la relación con Elba Morales se fue deteriorando por culpa de Félix González. Arguyeron que, debido a ello y luego de no saber de su madre por un tiempo prologando, en el año 2011 decidieron instar una *Petición de Derechos de Personas de Edad Avanzada* ante el Tribunal de Primera Instancia. Indicaron que esta petición fue rechazada por la causante, quien solicitó que estos no se contactaran con ella. Según adujeron, dicha acción fue en protección de Félix González. Luego de esto, intentaron mantener comunicación con la causante a través de otros familiares, pero al contactar a Félix González para indagar sobre el estado de Elba Morales, el mismo contestaba que ella estaba bien. Plantearon que, no fue hasta que, a insistencia de José Sánchez en mayo de 2018, un familiar se personó a la residencia de la causante, y al encontrarse con uno de los vecinos, se enteró que Elba Morales había fallecido el 26 de mayo de 2017, sin que ello le fuese notificado a estos. Tampoco tuvieron conocimiento de lo que ocurrió con su madre ni dónde había sido enterrada.

La parte apelada alegó, además, que Félix González no había cumplido con sus obligaciones como albacea, toda vez que no existía el Informe de Valoración sobre la propiedad en controversia, ni evidencia de las cuentas bancarias pertinentes. De igual forma, sostuvieron que Félix González llevaba haciendo uso y disfrute de dicha propiedad desde el

fallecimiento de la causante, sin pagar cánones de arrendamiento. Por último, señalaron desconocer el paradero de los bienes muebles de la causante así como los efectos personales de estos, los cuales exigieron se les entregaran de inmediato.

Por su parte, el 22 de junio de 2019, los apelantes presentaron su *Contestación a la Demanda,* en la cual solicitaron, en esencia, que se declarara No Ha Lugar la demanda con relación a la acción de daños. Asimismo, con relación a la acción de partición de herencia, solicitaron que se llevaran a cabo los procedimientos pertinentes a dicha partición y que se impusiera a la parte apelada el pago de los gastos, costas y honorarios de abogado.

Luego de varios trámites procesales y culminado el descubrimiento de prueba, se celebró el juicio en su fondo los días 5 y 6 de abril de 2022. En dichas vistas se presentó prueba documental, así como los testimonios de las partes.

Finalizado el desfile de prueba, los representantes legales de las partes presentaron sus respectivas argumentaciones.

Evaluadas las posturas de las partes, el 29 de junio de 2022, el Tribunal de Primera Instancia emitió y notificó la *Sentencia* que nos ocupa, mediante la cual declaró Ha Lugar la demanda incoada por la parte apelada.[5] Desglosó las siguientes determinaciones de hechos:

1. Doña Elba Gloria Morales[,] conocida también como Elba Gloria Carrillo Morales[,] otorgó la escritura número [c]incuenta y uno (51) de Compraventa Reconociendo y Asumiendo Hipoteca de la propiedad objeto de esta controversia.

2. La descripción de la propiedad objeto de controversia es la siguiente:

   --URBANA: Solar marcado con el número cinco (5) del bloque B de la Urbanización Metrópolis, radicado en el Barrio Martín González, de Carolina, Puerto Rico, con un área superficial de TRE[SC]IENTOS SESE[N]TA Y UNO PUNTO DIEZ (361.10) METROS CUADRADOS. Colindando por el Norte, con la calle número uno (1), en una longitud de Quince punto setenta (15.70) metros; por el Sur, con los solares números cuarenta y seis (46) y cuarenta y siete (47), en una longitud de quince punto setenta (15.70)

---

[5] Apéndice 82 del recurso, págs. 481-499.

metros; por el Este, con el solar número cuatro (4), en una longitud de veintitrés (23) metros, y por el Oeste, con el solar número seis (6) en una longitud de veintitrés (23) metros. En este solar enclava una casa de concreto para vivienda.

--Dicha propiedad está inscrita al folio doscientos once (211) del tomo ochocientos seis (806), de Carolina, finca número treinta y dos mil trescientos ochenta (32,380) inscripción primera.

3. Doña Elba Gloria Morales no ejercía profesión alguna, recibiendo solo como ingreso el pago por concepto de seguro social.

4. La causante, Elba Gloria Morales Carrillo, otorgó un Testamento Abierto el 28 de enero de 2013, ante el hoy representante legal de los codemandados, el Lcdo. Antonio Bauzá Torres.

5. En su testamento la causante instituyó como herederos en el tercio de legítima corta a sus hijos María de Los Ángeles García Carillo, Zenaida Sánchez Carrillo, José Ramón Sánchez Carrillo, Elba Gloria González Carrillo, Elba Inés González Carrillo y Félix González Carrillo. El tercio de mejora y libre disposición lo dejó a su hijo Félix González Carrillo quien además fue designado albacea en el referido testamento.

6. La causante, Elba Gloria Morales Carrillo, falleció en Carolina, Puerto Rico, el 26 de mayo de 2017.

7. Ninguno de los codemandados notificó a los codemandantes del fallecimiento de su señora madre.

8. Desde el 26 de mayo de 2017 hasta el día de hoy, el codemandado Sr. Félix González Carrillo se encuentra haciendo uso y disfrute exclusivo de la propiedad sin pago de renta alguna a los herederos.

9. La propiedad fue valorada en $90,000.00 dólares, según el Informe de [v]aloración reciente.

10. Mediante el testimonio del codemandante, el Sr. José Sánchez Carrillo, se probó que este estuvo destacado en el servicio militar desde el 1972 en los Estados Unidos.

11. Así las cosas, mediante el testimonio del Sr. Sánchez, como el Exhibit cuatro (4) estipulado por las partes titulado "Declaración Jurada por los Padres para Probar su Dependencia", se probó ante este Honorable Tribunal que la causante Doña Elba Gloria Carrillo:

   a. Residía en el Residencial Público Las Casas, Edificio 36, Apt. 559 en Villa Palmera con sus cuatro (4) hijos menores de edad.
   b. Que sus únicos ingresos eran lo recibido por el seguro social, así como la ayuda que le enviaba su hijo, Don José Sánchez, para un total de $339.20 mensuales.
   c. Que los gastos de Doña Elba ascendían a la cantidad de $410.00 dólares mensuales.

d. Que doña Elba no recibía ingresos suficientes para su sostenimiento.

12. El 10 de julio de 1972 el Sr. Sánchez solicitó que se declarara a la causante Doña Elba Gloria Carrillo como su dependiente mientras estuvo en el ejército, siento esto concedido por el Ejército de los Estados Unidos de América.

13. Mediante el testimonio del Sr. Sánchez se probó que este supo que la propiedad ubicada en la Urbanización Metrópolis, B-5, en Carolina, a través de su madre estaba en venta y decidió alquilarla.

14. Como no estaba físicamente en Puerto Rico, comenzó a enviarle dinero adicional a la causante en concepto de depósito para adquirir la propiedad para él y cubrir [los] gastos de compraventa.

15. Así las cosas, mediante el testimonio del Sr. Sánchez se probó que, pese a estar proveyendo el dinero para comprar la propiedad, al momento de la compraventa, se encontraba activo en los Estados Unidos.

16. Como el Sr. Sánchez estaba activo en el ejército, no le permitieron viajar a PR, por lo que su madre compareció sola a la autorización de la escritura de compraventa del 23 de noviembre de 1973.

17. Mediante el testimonio al Sr. Sánchez, creído por este Tribunal, al este regresar del ejército, se fue a vivir a su propiedad ubicada en la Urbanización Metrópolis, B-5 en Carolina donde ya se encontraban residiendo su madre y hermanos.

18. Mediante testimonio del Sr. Sánchez, creído por este Tribunal y los Exhibits (2), (3), (4), (5), (6) de la parte demandante y nueve (9) de los documentos estipulados por las partes, se probó que el Sr. Sánchez pagó con sus propios ingresos, la hipoteca que pesaba sobre la propiedad ubicada en la urbanización Metrópolis, B-5 de Carolina, desde 1975 hasta su saldo en el 1997, para un total de **$57,344.38** dólares.

19. Del testimonio de las codemandantes Doña Elsa y Elba González Carillo, se probó que quien pagaba la propiedad era el Sr. Sánchez con ingresos propios.

20. A través del testimonio del Sr. Sánchez, Doña Elsa y Elba González, creídas por este Tribunal, se probó que la relación con su madre se deterioró por actuaciones de Don Félix [González].

21. Se probó mediante el testimonio del Sr. José Sánchez, Doña Elsa y Elba González que tanto los codemandados Zenaida Sánchez y Féli[x] González, controlaban la interacción entre los demandantes y su madre hasta que estos, poco a poco, perdieron totalmente comunicación con la causante.

22. Se probó mediante el testimonio de los codemandados Zenaida Sánchez y Félix González, que doña Elba falleció el 26 de mayo de 2017 y estos decidieron, libre y voluntariamente, no notificarles a sus hermanos los codemandantes del fallecimiento de la causante.

23. Se probó mediante el testimonio de los codemandantes, el Sr. Sánchez, Elba y Elsa González, que estos fueron notificados del fallecimiento de su madre después de un (1) año de esta haber fallecido.

24. Se probó mediante el testimonio del codemandado Félix [González], que el cuerpo de Doña Elba fue cremado y enterrado en el patio de la propiedad sin contar con los debidos permisos gubernamentales para ello, ni solicitar autorización de sus hermanos.

25. Mediante el testimonio del Sr. Sánchez, Elsa y Elba Carrillo, así como los codemandados Félix González y Zenaida Carrillo, se demostró que el codemandado Félix [González] luego de la muerte de Doña Elba, continuó residiendo la propiedad ubicada en la Urb. Metrópolis, de forma exclusiva, sin pagar arrendamiento por su uso a la sucesión o al Sargento Sánchez como su dueño.

26. Que mediante el testimonio de los codemandantes el Sr. Sánchez, Elsa y Elba González, se demostró que estos tienen objetos personales en la propiedad, que no han sido entregados por los codemandados.

27. Que mediante el testimonio de los codemandantes el Sr. Sánchez, Elsa y Elba González, se demostró los daños emocionales que estos han sufrido a causa de las actuaciones negligentes y de mala fe de los codemandados, Zenaida Sánchez, María de los Ángeles Sánchez y Félix González.

28. Que la Sra. María de los Ángeles Sánchez Carrillo no estuvo presente en la vista en su fondo sin que se mostrase causa para ello.[6]

Inconforme con dicha determinación, el 2 de septiembre de 2022, la parte apelante acudió ante nos mediante el recurso de epígrafe y realizó los siguientes señalamientos de error:

> Erró el TPI en su determinación declarando sin lugar la moción de desestimación por falta de parte indispensable y negándose a ordenar a la parte demandante enmendar su demanda para traer a la parte indispensable.

> Erró el TPI al resolver en su Sentencia, objeto del presente recurso que el demandante José Ramón Sánchez Carrillo tiene un crédito por la cantidad de $57,344.38 por pagos realizados a la hipoteca cuyo balance era de $24,249.02.

> Erró el TPI al resolver en su Sentencia, objeto del presente recurso, que el demandante José Ramón Sánchez Carrillo

---

[6] Apéndice 16 del recurso, págs. 77-95.

tiene un crédito por la cantidad de $57,344.38 por pago realizado a la hipoteca cuyo balance era de $24,249.02 aun cuando la evidencia se desprende que hasta el 1 de marzo de 1975 el pago de la hipoteca la hizo la causante y luego a partir del 1 de marzo de 1976 y hasta noviembre de 1977, se hizo una cuenta conjunta entre la causante y el demandante José Ramón Sánchez Carrillo.

Erró el TPI al condenar a los demandados al pago de la suma de $15,000.00 por no haber notificado a los demandantes del fallecimiento de su señora madre.

Erró el TPI al condenar a la codemandada María De Los Ángeles García Carrillo a pagar la suma de $15,000.00 por daños a la parte demandante cuando no hubo prueba alguna de actuación negligente de esta.

Erró el TPI al condenar a Félix González Carrillo a pagar la cantidad de $12,867.00 por el pago de arrendamiento del mes de junio del 2017 hasta junio de 2022, a razón de $214.45 mensuales.

En cumplimiento con nuestra *Resolución* del 7 de septiembre de 2022, el 7 de octubre del mismo año, la parte apelada compareció mediante *Réplica a Apelación* Civil. Luego de someter la transcripción de la prueba oral estipulada, el 12 de enero de 2023, la parte apelante presentó un *Alegato Suplementario*. Por su parte, el 6 de marzo de 2023, los apelados presentaron una *Réplica a Alegato Suplementario*.

Con el beneficio de la comparecencia de las partes, así como la transcripción de la prueba oral, procedemos a resolver.

**II**

**A**

Sabido es que este Tribunal Apelativo actúa, esencialmente, como foro revisor. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770 (2013). Es por ello que, nuestra encomienda principal es examinar cómo los tribunales inferiores aplican el Derecho a los hechos particulares de cada caso. *Íd.* Cónsono con lo anterior, el desempeño de nuestra función revisora se fundamenta en que el Tribunal de Primera Instancia desarrolle un expediente completo que incluya los hechos que haya determinado ciertos a partir de la prueba que se le presentó. *Íd.* Es decir, nuestra función de aplicar y pautar el Derecho requiere saber cuáles son los hechos, tarea que corresponde, primeramente, al foro de instancia. *Íd.* Como foro apelativo, no celebramos juicios plenarios, no presenciamos el testimonio

oral de los testigos, no dirimimos credibilidad y no hacemos determinaciones de hechos. *Íd.* Esa es la función de los tribunales de primera instancia. *Íd.*

Por el contrario, al momento de analizar prueba documental, prueba pericial o testimonios de testigos ofrecidos mediante declaraciones escritas, estamos en la misma posición que el Tribunal de Primera Instancia. *Ortiz et al. v. S.L.G. Meaux*, 156 DPR 488, 495 (2002). Así, "el Tribunal Apelativo tendrá la facultad para adoptar su propio criterio en la apreciación y evaluación de la prueba pericial, y hasta para descartarla, aunque resulte técnicamente correcta". *Santiago Ortiz v. Real Legacy et al*., 206 DPR 194, 219 (2021), citando a *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011). Asimismo, es norma básica que las conclusiones de derecho son revisables en su totalidad por el foro apelativo. *Dávila Nieves v. Meléndez Marín*, supra, pág. 770. Ahora bien, como norma general, los tribunales apelativos aceptan como correctas las determinaciones de hechos de los tribunales inferiores, así como su apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba presentada en la sala. *Íd.*, pág. 771.

En nuestro ordenamiento jurídico no se favorece la intervención de los foros apelativos para revisar la apreciación de la prueba, la adjudicación de credibilidad o las determinaciones de hechos formuladas por el Tribunal de Primera Instancia, en ausencia de pasión, prejuicio, parcialidad o error manifiesto. *Pueblo v. Hernández Doble*, 210 DPR 850 (2022); *Santiago Ortiz v. Real Legacy et al.*, supra. Ello, debido a que el foro de instancia está en mejor posición que un tribunal apelativo para llevar a cabo esta importante tarea judicial. *Dávila Nieves v. Meléndez Marín*, supra, pág. 771.

En consideración a la norma de corrección que cobija a las determinaciones realizadas por el Tribunal de Primera Instancia, cuando una parte peticionaria señala errores dirigidos a cuestionar la apreciación o suficiencia de la prueba, la naturaleza del derecho apelativo requiere que esta ubique al foro revisor en tiempo y espacio de lo ocurrido en el foro

primario. Ello se logra utilizando alguno de los mecanismos de recopilación de prueba oral, como lo son: (1) transcripción de la prueba, (2) exposición estipulada o (3) exposición narrativa. *Pueblo v. Pérez Delgado*, 2023 TSPR 35, 211 DPR ___ (2023). Los tribunales de mayor jerarquía no pueden cumplir a cabalidad su función revisora sin que se le produzca, mediante alguno de estos mecanismos, la prueba que tuvo ante sí el foro primario. *Íd.*

**B**

El estado de derecho vigente establece que las personas que tengan un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas, según corresponda. Regla 16.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 16.1. *Parte Indispensable* es aquella de la cual no se puede prescindir, cuyo interés en la controversia de que trate es de tal magnitud que no puede dictarse un decreto final entre las otras partes sin lesionar y afectar radicalmente sus derechos. *Allied Mgmt. Group v. Oriental Bank*, 204 DPR 374 (2020); *López García v. López García*, 200 DPR 50 (2018). Por ello, el interés mutuo en cuestión tiene que ser de tal orden que impida producir un decreto sin que se vea afectado. *Pérez Ríos y otros v. Luma Energy, LLC*, 2023 TSPR 136, resuelto el 16 de noviembre de 2023. Ese interés común tiene que ser también real e inmediato, no uno futuro ni constitutivo de meras especulaciones. *Íd.*; *Colón Negrón et al. v. Mun. Bayamón*, 192 DPR 499 (2015); *Cirino González v. Adm. Correción et al.*, 190 DPR 14 (2014); *García Colón et al. v. Sucn. González*, 178 DPR 527 (2010).

La determinación sobre si una persona tiene un interés real e inmediato en la acción requiere una evaluación caso a caso, mediante un enfoque pragmático. *FCPR v. ELA et al.,* 2023 TSPR 26, 211 DPR ___ (2023). "A tal efecto, el tribunal deberá examinar los interes envueltos y distinguir entre los diversos géneros de casos". *Íd.,* pág. 8. Además, se debe tomar en consideración lo siguiente: tiempo, lugar, modo,

alegaciones, prueba, clase de derechos, intereses en conflicto, resultado y formalidad. *Íd.*

La interpretación adoptada por el Tribunal Supremo de Puerto Rico para determinar quién es parte indispensable tiene un alcance restringido. Así, al expresar: *sin cuya presencia no pueda adjudicarse la controversia*, nuestro más Alto Foro ha precisado que, "excepto en aquellas circunstancias en las que la adjudicación sin la persona ausente tendría un efecto perjudicial sobre el interés real e inmediato que ésta tiene en el pleito, en raras ocasiones será imposible resolver la controversia sin su presencia*". García Colón et al. v. Sucn. González*, supra, pág. 549. En dicha consideración, los tribunales están llamados a efectuar un análisis juicioso sobre las prerrogativas de quienes estén ausentes en el pleito y de las consecuencias de ser unidos a la acción. *Allied Mgmt. Group v. Oriental Bank*, supra; *López García v. López García*, supra. Por tanto, el fin de esta norma es proteger a la persona que no está presente de los efectos legales de la sentencia correspondiente, así como, también, evitar la multiplicidad de los pleitos *FCPR v. ELA et al.,* supra; *López García v. López García,* supra.

Nuestro estado de derecho establece que es nula la sentencia que se emita en ausencia de parte indispensable. *FCPR v. ELA et al.,* supra. Cónsono con lo anterior, "[l]a inclusión en el pleito de una parte indispensable constituye una defensa irrenunciable". *Pérez Rosa v. Morales Rosado*, 172 DPR 216, 223 (2007). Por tal razón, se puede invocar en cualquier momento del proceso judicial, aun, por primera vez, en apelación. *Íd.* Incluso, un tribunal apelativo puede aducirlo *sua sponte,* ya que, en su ausencia, los tribunales de justicia carecen de jurisdicción para atender la controversia sometida a su escrutinio. *López García v. López García*, supra; *Bonilla Ramos v. Dávila Medina*, 185 DPR 667 (2012). Del mismo modo, la omisión de traer a una parte indispensable al pleito constituye una violación al debido proceso de ley que le cobija al ausente, hecho que invita a la desestimación de la acción. *Colón Negrón et al. v.*

*Mun. Bayamón*, supra; *Pérez Rosa v. Morales Rosado,* supra. "Sin embargo, dicha desestimación no tendrá el efecto de una adjudicación en los méritos ni, por ende, de cosa juzgada". *Pérez Rosa v. Morales Rosado,* supra, pág. 224.

**C**

El Artículo 1006 del Código Civil de Puerto Rico, 31 LPRA sec. 2872,[7] autoriza a cualquiera de los herederos a solicitar la partición judicial de una herencia cuando no haya acuerdo del modo en que se llevará a cabo la partición. Tal acción es el procedimiento judicial adecuado para ponerle fin al estado de indivisión de una herencia y su propósito es obtener la terminación de la comunidad hereditaria. *Sucn. Maldonado v. Sucn. Maldonado*, 166 DPR 154, 176 (2005); *Arrieta v. Chinea Vda. de Arrieta*, 139 DPR 525, 534 (1995). Consecuentemente, la cotitularidad sobre un patrimonio relicto finaliza con la partición de la herencia. *Sucn. Sepúlveda Barreto v. Registrador,* 125 DPR 401, 405 (1990), citando a E. González Tejera, Derecho Sucesorio Puertorriqueño, San Juan, Ed. Ramallo, 1983, Vol. 1, pág. 294.

Con relación al procedimiento de la partición de la herencia, el Profesor González Tejera explica que, para llevar una partición de herencia viable, es menester llevar a cabo varias operaciones previas. E. González Tejera, Derecho de Sucesiones; La Sucesión Intestada, Ed. Universidad de Puerto Rico, San Juan, 2002, Vol.1, pág. 402. Las operaciones particionales previas son: inventario y avalúo, liquidación, división, formación de lotes o hijuelas y la adjudicación. J. R. Vélez Torres, Curso de Derecho Civil: Derecho de Sucesiones, 2da ed., San Juan, Universidad Interamericana de Puerto Rico, 1997, Tomo IV, Vol. III, pág. 523. Una vez se paguen las deudas y las cargas de la herencia, el remanente que resulte es lo que recibirán los herederos. E. Martínez Moya, El Derecho Sucesorio Puertorriqueño, 67 Rev. Jur. UPR 1, 42 (1998).

---

[7] El derecho aplicable en el caso de autos se remite al Código Civil de Puerto Rico de 1930, 31 LPRA sec. 1 *et seq.* (derogado), toda vez que nos encontramos ante hechos ocurridos con anterioridad a la aprobación y vigencia del Código Civil de Puerto Rico de 2020, Ley Núm. 55-2020, 31 LPRA sec. 5311 *et seq.*

Así las cosas, mediante el acto de la partición, los herederos, quienes antes eran titulares de una cuota abstracta sobre la totalidad del caudal hereditario, "convierten sus participaciones indivisas en la herencia en bienes determinados o cuotas sobre bienes determinados". *Sucn. Sepúlveda Barreto v. Registrado*r, supra, pág. 405, citando a F. Puig Peña, Tratado de Derecho Civil Español, Madrid, Ed. Rev. Der. Privado, 1965, T. V, Vol. III, pág. 162. Por lo cual, es menester distinguir la diferencia entre la comunidad hereditaria y la comunidad de bienes. Pues, en una comunidad de bienes coinciden diversos titulares sobre uno o más bienes; en una comunidad hereditaria existe una cotitularidad sobre un patrimonio del caudal relicto. Es decir, en la comunidad hereditaria, los herederos no tienen la titularidad sobre bienes particulares sino sobre una cuota en abstracto sobre el patrimonio del fenecido*. Kogan v. Registrador*, 125 DPR 636, 651-652 (1990), citando a González Tejera, *op. cit.*, págs. 294-295.

Asimismo, mientras la comunidad hereditaria permanezca indivisa, los herederos pueden enajenar su cuota abstracta, aun cuando no se ha realizado la partición. *Kogan v. Registrador*, supra, pág. 652. De otro modo, los herederos pertenecientes a una comunidad hereditaria pueden vender o gravar un bien específico que pertenezca a la herencia antes de la partición, mientras ostenten el consentimiento de todos los herederos. *Íd.*

**D**

Una comunidad de bienes existe cuando la propiedad de una cosa o de un derecho pertenece proindiviso a varias personas. Art. 326 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 1271. La participación de los comuneros será en proporción a sus respectivas cuotas, tanto en los beneficios como en las cargas. Art. 327 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 1272. El Código Civil de Puerto Rico también dispone que "[n]ingún copropietario está obligado a permanecer en la comunidad", por lo que cada uno de ellos podrá pedir que se divida la cosa común en cualquier tiempo. Art. 334 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 1279. Además, establece que, si la cosa común fuere

esencialmente indivisible, y los codueños no convinieron en que se adjudique a uno de ellos indemnizando a los demás, esta se venderá y su precio se repartirá. Art. 338 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 1283. En ese sentido, es importante destacar que la división de la comunidad de bienes se regirá conforme a las normas concernientes de la división de una herencia. Art. 340 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 1285. Véase, además, *Díaz v. Aguayo*, 162 DPR 801, 809 (2004).

En cuanto al uso y disfrute de la cosa común, el Artículo 328 del Código Civil de Puerto Rico 1930 establece que: "[c]ada partícipe podrá servirse de las cosas comunes, siempre que disponga de ellas, conforme a su destino y de manera que no perjudique el interés de la comunidad, ni impida a los copartícipes utilizarlas según su derecho". 31 LPRA sec. 1273. Este derecho del uso del bien común está sujeto a restricciones básicas. *Díaz v. Aguayo*, supra, pág. 809. Sobre ese particular, el Tribunal Supremo de Puerto Rico ha establecido que el derecho del uso está limitado a lo siguiente: (1) el uso que se da a la cosa tenida en común debe ser conforme a su destino; (2) no debe perjudicar el interés de la comunidad; y (3) el uso de la cosa común por un comunero no ha de impedir el uso por los copartícipes conforme a su derecho. *Íd*.

Cónsono con lo anterior, el más Alto Foro ha resuelto que un comunero no puede usar o disfrutar de forma exclusiva de un bien común sin pagar a los demás comuneros por dicho beneficio privativo. *Díaz v. Aguayo*, supra, pág. 811. Asimismo, ha establecido que, si solo uno de los cónyuges mantiene el control y uso de los bienes de la comunidad, el otro cónyuge tiene derecho como comunero a que su excónyuge le pague una suma líquida específica periódica. *Íd*. Esto así ya que el "uso exclusivo del bien común por uno s[o]lo de los comuneros sin resarcir al otro es contrario a principios elementales de derecho, basados en la equidad, que no permiten el enriquecimiento injusto". *Íd.*, pág. 814.

En *Molina González v. Álvarez Gerena*, 203 DPR 442 (2019) el Tribunal Supremo de Puerto Rico enfatizó que, para tener derecho al pago de una compensación, el comunero que alega haber sido excluido de su participación en la comunidad, deberá identificar un acto obstativo que suponga tal exclusión o un requerimiento afirmativo del comunero que alega ser excluido. Puntualizó, además, que este examen requiere un análisis detenido de los hechos de cada caso y, forzosamente, que se tome en consideración la relación entre los comuneros.

En cuanto a cómo se computan las rentas adeudadas, en *Díaz v. Aguayo*, supra, pág. 814, nuestro Tribunal Supremo concluyó que el método para computar ese crédito era el canon de arrendamiento de una propiedad similar para las fechas precisas. Es decir, le corresponde al comunero que reclama dichos créditos el peso de establecer cuál era el canon de arrendamiento que imperaba, para una propiedad similar, durante todas las fechas pertinentes a su reclamo.

**E**

Sabido es que el enriquecimiento injusto es un principio general de Derecho que parte de la noción básica de que todo desplazamiento patrimonial debe responder a una causa legítima. *SLG Sánchez v. SLG Valentín*, 186 DPR 503, 515-516 (2012). Se trata de una norma cimentada en criterios de equidad "que puede aplicarse a situaciones muy distintas entre sí, siempre y cuando tengan en común un elemento: el que de no aplicarse se perpetraría la inequidad de que alguien se enriqueciese injustamente en perjuicio de otro". *Íd.*, pág. 515, citando a *Silva v. Comisión Industrial,* 91 DPR 891, 897-898 (1965). Al igual que otras acciones basadas en los principios de equidad, el enriquecimiento injusto solo procederá cuando no exista una ley que provea para otra causa de acción. *ELA v. Cole*, 164 DPR 608, 632 (2005). Deberán, también, coincidir los siguientes criterios: (1) Existencia de un enriquecimiento; (2) Un empobrecimiento correlativo; (3) Una conexión entre el empobrecimiento y el enriquecimiento; (4) Falta de causa que justifique el enriquecimiento;

(5) Inexistencia de un precepto legal que excluya la aplicación del enriquecimiento sin causa. *SLG. Sánchez v. SLG Valentín,* supra*, pág. 516; Mun. Quebradillas v. Corp. Salud Lares*, 180 DPR 1003, 1019-1020 (2011).

La aplicación de la figura jurídica de enriquecimiento injusto, además, dependerá de las circunstancias particulares de cada caso. *Plan Bienestar Salud v. Alcalde Cabo Rojo*, 114 DPR 697, 703 (1983). Sin embargo, dicha figura no es invocable cuando tenga por efecto vulnerar un principio importante de orden público encarnado en la Constitución o las leyes del país. *Hatton v. Mun. de Ponce*, 134 DPR 1001, 1010 (1994). Consecuentemente, tampoco procederá cuando contravenga alguna política pública del Estado. *Íd.*

**F**

El Artículo 1802 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 5141, da origen a la responsabilidad civil extracontractual. El mismo establece que "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado". *Íd.* Para que progrese una acción por daños y perjuicios, es necesario probar la ocurrencia de una acción u omisión culposa o negligente que ocasiona un daño, así como la existencia del nexo causal entre ambos. *Cruz Flores et al. v. Hospital Ryder et al.*, 210 DPR 465 (2022).

El daño es "todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra". J. Puig Brutau, Fundamentos de Derecho Civil, Barcelona, Ed. Bosch, 1983, T. 2, Vol. 3, pág. 92. Por otro lado, el daño patrimonial consiste en el menoscabo sobre el patrimonio del perjudicado que es valorable en dinero. *Sagardía de Jesús v. Hosp. Aux. Mutuo,* 177 DPR 484*,* 506 (2009). En cambio, los daños morales, son daños no patrimoniales que esencialmente afectan los derechos de la personalidad, física o moral, del ser humano. *Íd.* Por su parte, el dolor físico o corporal, las angustias mentales y los sufrimientos constituyen daños morales. *Íd.*, pág. 507.

Por otro lado, la culpa o negligencia es la falta del debido cuidado que consiste en no anticipar y prever las consecuencias racionales de un acto, o la omisión de un acto, que una persona prudente y razonable habría previsto en las mismas circunstancias. *Cruz Flores et al. v. Hospital Ryder et al.,* supra. Ahora bien, el deber de previsión se se extiende a aquel daño que llevaría a una persona prudente a anticiparlo. *Santiago v. Sup. Grande*, 166 DPR 796, 808 (2006).  Es decir, para que ocurra un acto negligente "es suficiente que el actor haya previsto que su conducta probablemente resultaría en daños de alguna clase a alguna persona aunque no hubiese previsto las consecuencias particulares o el daño específico que resultó, ni el mecanismo particular que lo produjo, ni la persona específica del perjudicado". *López v. Porrata Doria*, 169 DPR 135, 164 (2006), citando a H.M. Brau del Toro, Los daños y perjuicios extracontractuales en Puerto Rico, 2da ed. San Juan, Pubs. J.T.S, 1986, págs. 184-185.

Así pues, para fines de imputar negligencia, es forzoso identificar si la persona demandada podía prever, dentro de las circunstancias particulares pertinentes, que su acción u omisión podría causar algún daño. *Colón, Ramírez v. Televicentro de P.R.*, 175 DPR 690, 706 (2009). Cónsono con el deber de previsión, una persona es responsable de las consecuencias probables de sus actos. *Blás v. Hosp. Guadalupe,* 146 DPR 267, 298 (1998). De ahí que se reconozca que la mera ocurrencia de un accidente no constituye prueba de la negligencia de la persona demandada en una acción sobre daños y perjuicios. *Admor. F.S.E. v. Almacén Ramón Rosa*, 151 DPR 711, 724 (2000).

Esbozada la norma jurídica, procedemos a aplicarla al recurso ante nos.

**III**

Conforme esbozáramos previamente, como norma general, los tribunales apelativos aceptamos como correctas las determinaciones de hechos de los tribunales inferiores, así como su apreciación sobre la credibilidad de los testigos y el valor probatorio de la prueba presentada en

sala. Los foros apelativos no debemos intervenir con la apreciación de la prueba de los foros primarios, salvo que exista pasión, prejuicio, parcialidad o error manifiesto. Es decir, el foro primario merece deferencia ante los planteamientos de error sobre admisibilidad de la prueba presentada y la apreciación que le confirió. En el caso de autos, la parte apelante sometió copia de la transcripción de la prueba oral vertida en el juicio en su fondo, por lo que, procedemos a evaluar las determinaciones de hecho realizadas por el foro *a quo*. Nuestra intervención se basa en la evaluación minuciosa de la prueba que obra en el expediente y de la transcripción provista.

Como primer señalamiento de error, la parte apelante sostiene que el Tribunal de Primera Instancia erró al declarar No Ha Lugar la moción de desestimación por falta de parte indispensable y negarse a ordenar a la parte apelada a enmendar su demanda para traer a dicha parte indispensable. Según mencionamos previamente en este recurso, la determinación sobre si una persona tiene un interés real e inmediato en la acción requiere una evaluación caso a caso en la que el tribunal deberá evaluar los diversos intereses envueltos. En el caso de autos, la controversia sobre la falta de parte indispensable fue correctamente atendida por el foro primario.

En las etapas iniciales del pleito, la parte apelante presentó una *Moción solicitando desestimación* por falta de parte indispensable. Arguyó que, en la deposición tomada a José Sánchez, este afirmó haber realizado los pagos correspondientes a la hipoteca de la propiedad inmueble de la causante con cargo a la sociedad legal de gananciales. Por lo tanto, expuso que Irma Castro, la ex esposa de José Sánchez, era parte indispensable en el pleito ya que podía tener una participación en el inmueble y sus derechos podían verse afectados con la eventual determinación en el caso de epígrafe. No obstante, la moción fue declarada No Ha Lugar por el foro primario y se ordenó la continuación de los procedimientos. Según surge de la transcripción de la prueba oral ante nos, durante el juicio, la parte apelante trajo a colación nuevamente el planteamiento de parte

indispensable. A esos efectos, el foro apelado determinó que dicho planteamiento había sido resuelto, por lo que lo declaró No Ha Lugar. Más aun, el Tribunal fue enfático en descartar el planteamiento de parte indispensable en la línea de preguntas que abordaban el tema de la utilización de fondos de la comunidad de bienes entre Irma Castro y José Sánchez para cubrir los gastos de vivienda de la causante.

De una revisión sosegada del expediente ante nos, así como el derecho aplicable, coincidimos con el foro *a quo* en que no hay falta de parte indispensable. Jurisprudencialmente se ha resuelto que la parte que invoca la defensa de parte indispensable tiene el peso de establecer dicho hecho mediante evidencia. Sobre este asunto, la parte apelante no ha presentado prueba alguna para establecer que Irma Castro es parte indispensable en este pleito. Por lo tanto, no le asiste razón.

Como segundo señalamiento de error, la parte apelante sostiene que erró el Tribunal de Primera Instancia al resolver que José Sánchez tiene un crédito por la cantidad de $57,344.38 por pagos realizados a la hipoteca, cuyo balance era de $24,249.02. En su tercer señalamiento de error, plantea que el foro primario incidió al determinar lo anterior, a pesar de que en el expediente obra evidencia de que la causante realizó dichos pagos hasta marzo de 1975, y no fue hasta noviembre de 1977 que se creó una cuenta conjunta entre esta y José Sánchez. Por estar los errores relacionados entre sí, los discutiremos conjuntamente. La parte apelante alega que José Sánchez tenía el deber de alimentar a su madre. Por lo tanto, entiende que no procede el crédito solicitado por este sobre las partidas pagadas a la hipoteca de la residencia principal de la causante. Sin embargo, de la transcripción de la prueba oral presentada surge que José Sánchez, además de pagar la hipoteca de la propiedad en cuestión, asistía a su madre con su manutención. Asimismo, se desprende de la evaluación y posterior determinación del Tribunal.

Por otra parte, la parte apelante plantea que el pago de la hipoteca, cuyo balance a la fecha de la adquisición del inmueble ascendía a

$24,249.02 ($181.00 mensuales), incluía un abono del principal además de cargos. Basado en esa premisa, los apelantes alegan que solo procedía acreditarle a la parte apelada los pagos al principal de la hipoteca, descartando los pagos existentes en otros conceptos. No le asiste razón en este argumento. Nos explicamos.

Al evaluar la totalidad del expediente, surge claramente que José Sánchez pagó la totalidad de la deuda, incluyendo intereses. Por esto, la Sucesión de Elba Carrillo le adeuda la suma total de sus pagos y no meramente el pago del principal de los mismos. De no adjudicarse la totalidad de lo pagado a dicha parte, según los establecido con la evidencia presentada ante el foro primario, y ante nuestra consideración, constituiría un enriquecimiento injusto a favor de la sucesión. Por consiguiente, no se cometieron los referidos errores.

Como cuarto señalamiento de error, la parte apelante sostiene que el foro *a quo* incidió al imponerle el pago de la suma de $15,000.00 por no haber notificado a los apelados del fallecimiento de su madre. En su quinto señalamiento de error, la parte apelante sostiene que erró el Tribunal de Primera Instancia al condenar a la codemandada María García a pagar la suma de $15,000.00 por daños a la parte apelada cuando no hubo prueba alguna de actuación negligente de esta. Sobre ese particular, la parte apelante argumenta que no existe ley o causa de daños que imponga el deber de una parte a notificarle a sus hermanos que su madre ha fallecido.

En el presente caso, según surge de la transcripción de la prueba oral, la parte apelada testificó que la relación con su madre, Elba Morales, se deterioró por las actuaciones de Félix González. Según declaró la parte apelada, las relaciones con su madre eran buenas. Sin embargo, con el pasar del tiempo, debido a las actuaciones de la parte apelante, la comunicación entre estas se comenzó a deteriorar. Mediante el testimonio de Félix González se probó que la parte apelante controló por un tiempo prolongado la interacción entre los apelados y su madre, hasta que eventualmente perdieron comunicación con la causante. Evaluados los

testimonios vertidos en el juicio en su fondo, así como la totalidad del expediente, colegimos en que la parte apelante deliberadamente omitió notificarles a los apelados sobre el fallecimiento de su madre Elba Morales. Asimismo, surge de la prueba testifical presentada en el juicio que María García fue cómplice, con su silencio, de las actuaciones de sus hermanos. En particular, Félix González admitió en el juicio que, luego de alegadamente haber cremado a su madre, la enterró en el patio de la propiedad, sin los debidos permisos gubernamentales para ello y sin solicitar la autorización de sus hermanos. Asimismo, se desprende que, los apelantes se negaron a proveer información sobre el paradero del cuerpo de la causante hasta el presente juicio.

Al evaluar el expediente, el 3 de octubre de 2023, este Tribunal le solicitó al foro primario que esbozara los precedentes utilizados para la compensación de daños y perjuicios, así como el cómputo realizado en su valorización de daños. A tenor con lo ordenado, el 5 de octubre de 2023, se presentó un *Dictamen Fundamentado* sobre la valorización de daños. Luego de evaluar el recurso, la prueba presentada y la transcripción de la prueba oral, entendemos que el foro primario no erró en su valorización de daños. Al igual que el foro de instancia, entendemos que la parte apelada sufrió daños emocionales irreparables al enterarse del fallecimiento de su madre, por medio de un tercero, un año después del deceso. En la transcripción de la prueba oral quedó demostrada la intención y acción deliberada de la parte apelante de ocultar el fallecimiento de la causante. Por tanto, no se cometieron dichos errores.

Por último, como sexto señalamiento de error, la parte apelante plantea que el Tribunal de Primera Instancia incidió al condenar a Félix González a pagar la cantidad de $12,867.00 por el pago de arrendamiento del mes de junio de 2017 hasta junio de 2022, a razón de $214.45 mensuales. Dicha parte alega que, por no haber hecho un requerimiento de pago previo a la radicación de la demanda de epígrafe, no procede el pago de renta. Asimismo, arguye que, según la doctrina de comunidad de

bienes, todo comunero puede usar la cosa común, siempre y cuando no afecte el interés de la comunidad y la utilice conforme a su destino. De igual modo, argumenta que la cantidad de $214.45 fue establecida sin evidencia suficiente para justificar su razonabilidad.

Según esbozado, como regla general, en una comunidad de bienes cada partícipe podrá servirse de las cosas comunes, siempre que disponga de ellas conforme a su destino y de manera que no perjudique el interés de la comunidad, ni impida a los copartícipes utilizarla según su derecho. En este caso, eso no ocurrió. Al omitir compartir la noticia del fallecimiento de Elba Morales, la parte apelante privó a los apelados de conocer y hacer uso de su participación en la comunidad hereditaria, perjudicando a su vez el interés de los demás miembros de la comunidad e impidiendo el uso de esta conforme a sus derechos. Por consiguiente, la utilización exclusiva por parte de Félix González se hizo sin autorización de los demás miembros de la Sucesión.

Nuestro Tribunal Supremo ha reiterado que un comunero no puede usar o disfrutar de forma exclusiva de un bien común sin pagar a los demás comuneros por su uso. Específicamente, en *Molina González v. Álvarez Gerena,* supra, el más Alto Foro estableció que el comienzo del uso exclusivo de la cosa por uno solo de los comuneros crea una obligación de compensar a los demás comuneros por tal uso. No obstante, la obligación de compensar al resto de los comuneros comienza a partir del momento en que se solicite por vía judicial el pago de rentas correspondientes. El comunero que entienda que ha sido privado de su derecho y en ausencia de pacto o reglamentación específica, tendrá que requerir al otro el uso de la cosa o el pago de renta por el uso exclusivo. Sin embargo, este requerimiento no será necesario cuando exista un acto específico de exclusión por parte del usuario en contra de los demás.

En este caso, el acto optativo de los apelantes fue ocultar el fallecimiento de Elba Morales. En mérito de lo anterior, y según determinó el foro apelado, la prueba desfilada ante sí demostró la temeridad

desplegada por la parte apelante, lo cual ameritaba la imposición de $12,867.99 por el arrendamiento de la propiedad de la comunidad hereditaria, desde el fallecimiento de Elba Carillo hasta la fecha de la sentencia. Por tanto, el error no se cometió.

Examinado lo anterior, así como la prueba documental que obra en autos, concluimos que el foro primario no incidió en su proceder. En consecuencia, determinamos que los errores imputados por la parte apelante no se cometieron.

**IV**

Por los fundamentos que anteceden, confirmamos el dictamen apelado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones